TALLMAN F. HULBERT, Plaintiff, v. FRED HULBERT et al.,
Defendants.

HELEN STORY et al., as Executors of LEONARD STORY,
Deceased, Appellants; WILLIAM F. BACON, Respondent.

Judgments — a judgment upon being filed and docketed
becomes a lien upon real estate without the issue of an execu-
tion — when the lien of several judgments is simultaneous, and
the real estate of the debtor sold in partition is insufficient to
pay the judgments in full, the proceeds of the real estate must
be applied pro rata — the fact that an execution has been issued
on one judgment does not give it priority.

1. Since the enactment of the Revised Laws of 1813 (Vol. 1, ch. 50,
p. 501), re-enacted, with amendments and amplifications, in the
Revised Statutes and now embodied in the provisions of the Code
of Civil Procedure (§§ 1250, 1251), a judgment upon being filed and
docketed becomes a lien upon the real estate of the debtor and it is
no longer necessary for that purpose that an execution should be
issued thereon.

2. From the moment a judgment is duly filed and docketed legal
rights in the real estate of the debtor attach, and where three
judgments were filed and docketed against a debtor who then had
no real estate, but six years later inherited an undivided interest in
real estate owned by his father at the time of his death, the liens of
the three judgments attached simultaneously to such interest of
the judgment debtor upon his acquiring title thereto.

3. Where one of the three judgment creditors caused an execu-
tion to be issued against the interest of the judgment debtor in
such real estate, and such interest was advertised and sold by the
sheriff under the execution, that fact does not entitle such judg-
ment creditor to a preference over the liens of the other judgment
creditors, and where the real estate owned by the father of the
judgment debtor at the time of his death, including the interest of
the judgment debtor therein, was thereafter sold under a judgment
in an action of partition, and the proceeds of the sale of the judg-
ment debtor's interest are insufficient to pay all of the three judg-
ment liens against him such proceeds should be applied pro rata
on all of the liens.

4. Statutes and authorities, both English and American, relating to the acquisition and perfecting of judgment liens upon real estate collated, discussed and applied herein. (*Adams* v. *Dyer*, 8 Johns. 347; *Waterman* v. *Haskin*, 11 Johns. 288, overruled.)

*Hulbert* v. *Hulbert*, 165 App. Div. 858, modified.

(Argued September 29, 1915; decided January 4, 1916.)

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered January 6, 1915, which affirmed an order of Special Term directing payment on certain judgment liens from proceeds arising from sale of the interest of one defendant in the real estate sold in the above-entitled action for partition.

The facts, so far as material, are stated in the opinion.

*George E. Zartman* for appellants. These three judgments became liens upon this real property at the same time. (*Goetz* v. *Mott*, 21 Abb. N. C. 246; *Matter of Hazard's Estate*, 75 Hun, 22; 141 N. Y. 586.) The judgment of the church did not obtain priority of lien by the issue of the execution and the sale thereunder. (*Atlas Refining Co.* v. *Smith*, 52 App. Div. 109; *Wood* v. *Colvin*, 5 Hill, 228; 1 Black on Judgments, § 450; *Matter of Hazard*, 141 N. Y. 586.)

*William F. Bacon* respondent, in person. The lien of the judgment docketed by St. Paul's Church obtained a preference over the liens of the two Story judgments against the interests which the judgment debtor subsequently acquired in the real estate in question, since the church, by placing an execution in the hands of the sheriff and proceeding to a sale thereunder, took the requisite measures for effectuating its lien, and so by its superior diligence turned the scale of equal rights; and the purchaser on the execution sale should receive from the moneys now in the hands of the county treasurer the amount

of his bid, to wit, $1,437.10, with interest to the date of payment. (*Matter of Hazard,* 73 Hun, 22; 141 N. Y. 586; *Atlas Refining Co.* v. *Smith,* 52 App. Div. 109; *Green* v. *Burke,* 23 Wend. 498; *Waterman* v. *Haskin,* 11 Johns. 228; *N. Y. Life Ins. Co.* v. *Mayer,* 19 Abb. N. C. 92; 14 Daly, 318; *Spring* v. *Sanford,* 7 Paige, 550; *Vaughn* v. *Ely,* 4 Barb. 159; *Elsworth* v. *Woolsey,* 19 App. Div. 385; 154 N. Y. 748; *Treacy* v. *Ellis,* 45 App. Div. 492; Code Civ. Pro. §§ 1563, 1564.)

SEABURY, J. This a proceeding in an action of partition for the distribution of the proceeds of a sale of real property. On March 7th, 1904, St. Paul's Church of the village of Waterloo, N. Y., docketed a judgment for $906.84 against Fred Hulbert. On April 21st, 1904, judgments for $2,830.57 and $2,351.71 respectively were docketed against said Hulbert by the defendant Story now deceased. All of these judgments were filed and docketed in the office of the clerk of Seneca county. At the time these judgments were docketed Hulbert was without property. In 1910, on the death of his father, Hulbert inherited an undivided one-third interest in the real estate which it was sought to partition in this action. On November 24th, 1913, pursuant to leave granted by the court, the St. Paul's Church issued an execution on its judgment against the property of said Hulbert. On February 6th, 1914, the sheriff of Seneca county sold Hulbert's undivided interest in said real estate to one Bacon who is a defendant herein, for the sum of $1,437.10 and issued to him a sheriff's certificate of sale which he now holds. The present action for partition or sale was not commenced until after the execution of the St. Paul's Church had been placed in the hands of the sheriff. The interest of the defendant Hulbert in said premises was sold in the partition action March 28th, 1914, for $1,753.36, which sum has been paid into the court subject to its further order. The proceeds of this sale are insuf-

ficient to pay all of the judgment liens in full. The appellants, who are executors of the estate of Story, claim that these proceeds should be applied *pro rata* on all of the liens. The respondent Bacon claims, and he has been accorded by the court below, a preference for his lien and the payment thereof has been ordered to be made in full. It is clear that Bacon acquired no rights as against the owner of the Story judgments, by virtue of the sale of the property to him and the delivery by the sheriff of a sheriff's certificate of sale, unless the fact that the execution issued by the St. Paul's Church and the act of the sheriff in advertising the property for sale served to give to the lien of the St. Paul's Church a preference over the liens of the Story judgments. It is necessary, therefore, to inquire what the status of the judgment liens was and whether the act of the St. Paul's Church in issuing an execution upon its lien and the act of the sheriff in advertising the property for sale gave to that lien a preference over the others. Pursuant to the settled rule, which is not questioned by either party upon this appeal, the three judgments referred to became liens on the after-acquired property of the judgment debtor at the time of its acquisition by the debtor. (*Matter of Hazard Estate,* 73 Hun, 22; affd. on opinion below, 141 N. Y. 586.) The liens of these three judgments, therefore, attached simultaneously to the interest of Hulbert upon his acquiring title to that interest on the death of his father. It was held below that the judgment of the St. Paul's Church acquired priority by reason of the execution issued thereon and the act of the sheriff in advertising the property for sale. The theory upon which the ruling was made was that the act of the St. Paul's Church in issuing the execution was such an exhibition of diligence as to entitle that judgment creditor to a preference over the liens owned by the other judgment creditors. The only authorities relied upon by the learned Appellate Division to sustain

28

this view were the cases of *Adams* v. *Dyer.* (8 Johns. 347, 350) and *Waterman* v. *Haskin* (11 Johns. 228). In *Adams* v. *Dyer* (*supra*) there is a short *per curiam* opinion which says: " Perhaps, the mere act of delivery of the execution to the sheriff, did not gain a preference *as to the lands*, but by the act of the sheriffs in making advertisement of the lands for sale, the first execution was begun to be executed. Here was an act by which priority, in some respects, was gained. There was priority as to the time of sale, and that priority could not be defeated by the second execution." The case of *Waterman* v. *Haskin* (*supra*) announces the same conclusion relying solely upon the authority of *Adams* v. *Dyer* (*supra*). Although our attention has not been called to any subsequent case in this jurisdiction which has followed the decision announced in these two cases, it must be conceded that the rule announced by them has been followed in other jurisdictions. (*Elston* v. *Castor*, 101 Ind. 426; *Lowry* v. *Reed*, 89 Ind. 442; *Smith* v. *Lind*, 29 Ill. 24; *Lippencott, Johnson & Co.* v. *Wilson*, 40 Iowa, 425; *Burney* v. *Boyett*, 2 Miss. [1 How.] 39.) Notwithstanding that the decision in *Adams* v. *Dyer* (*supra*) and *Waterman* v. *Haskin* (*supra*) has been followed in other jurisdictions, the rule announced by these decisions was early questioned in this state. In *Wood* v. *Colvin* (5 Hill, 228, 230 [1843]), BRONSON, J., speaking for the court, said: " It has on several occasions been taken for granted that there must be a levy on real estate; but the point has never been so adjudged. The cases are collected in *Green* v. *Burke*, (23 Wend. 498). When the judgment is a lien upon the land, it is not necessary that the sheriff should make any formal levy or seizure before proceeding to advertise and sell. It would be an idle ceremony for him to go to the land, or make an inventory of it, or do any other act of the like nature. The judgment binds the land, which is already in the custody of the law before the execution issues. The execution comes as a power to

enable the creditor to reap the fruits of the seizure already made.

"After lands were subjected to sale on execution, and before the judgment was made a lien, (see per Chancellor LANSING in *Catlin* v. *Jackson*, 8 John. R. 546), the sale of lands and of goods on execution stood substantially upon the same footing, and a levy or seizure was necessary in the one case as well as in the other. But when the judgment was afterwards made a lien on the land, there was no longer any reason for requiring a levy before the sheriff proceeded to advertise and sell. The seizure was already made when the execution came to his hands. Lawyers and judges have still continued to speak of the supposed necessity of a levy upon land, without adverting to the fact that the reason for the rule had entirely ceased. But as there is nothing but *dicta* upon the point, we feel ourselves at liberty to say, that since the judgment has been made a lien upon the land, no formal levy or seizure by virtue of the execution is necessary."

A good deal of confusion has arisen and the decisions seem not to be in harmony as to the status of the judgment lien. This condition seems to have arisen because of the statutory changes that have been made. A review of the changes which the law upon this subject has undergone will tend to a better understanding of the existing rule which we are called upon to apply to this case. At common law when a judgment has been rendered for a debt the sheriff was directed to cause the sum needed to be made (*fieri facias*) out of the goods and chattels of the defendant or levied (*livari facias*) out of his goods and the fruits of his land, but the land itself was not subject to be taken in satisfaction of the debt. "Our common law," say Pollock & Maitland in their History of English Law, "will not seize his land and sell it or deliver it to the creditor; seignorial claims and family claims have prevented men from treating land as an available asset for the payment of debts." (Vol. 2 [2d ed.], p. 596.) In 1285,

by virtue of the statute of Westminster 2 (13 Edw. I), c. 18, the *election* was given to a creditor who sued for such debt or damages to have a writ to the sheriff " for levying the debt of the lands and chattels, or that the sheriff deliver to him all the chattels of the debtor (except his oxen and beasts of the plough) and a moiety of his land until the debt be levied." The writ of *elegit* was founded upon this statute. It was subject to certain restrictions and operated differently even as to chattels from a *fieri facias*. (2 Tidd's Prac. 939.) These restrictions need not now be commented upon, as our purpose will be served by tracing the procedure that was pursued under it in reference to the lands of the debtor. If the debtor had no land the sheriff need not take or return an inquisition. If there were lands it was necessary that the inquisition should be taken and returned, describing the land with convenient certainty, and after it is taken the sheriff delivers a moiety to the plaintiff by metes and bounds. (2 Tidd's Prac. 940.) It was formerly usual for the sheriff to deliver *actual* possession of a moiety of the lands, but at the time Mr. Tidd wrote his practice of the King's Bench (1807) the sheriff was only required to deliver legal possession, and in order to obtain actual possession the plaintiff must proceed by ejectment. The writ of *elegit*, however, has been said to be " almost unknown in the United States." (Freeman on Executions, § 370.) There are, however, instances of its use in Virginia, Alabama, North Carolina and Delaware. (Freeman on Executions, § 370.) Although authorized in New York, in practice it is doubtful if it was ever adopted. In commenting upon it Chancellor LANSING said: " Whether the *elegit* was ever introduced in practice, is doubtful, as the small value of the income of real estates, afforded little inducement to resort to it, as a means of satisfying a debt due upon a judgment." (*Catlin* v. *Jackson, supra,* at p. 547.)

Prior to 1732 no judicial sale of land could be made

in New York under any common-law process. Such a sale was expressly prohibited by the so-called "Charter of Libertyes & Priviledges" which was enacted by the colonial legislature October 30th, 1683. (Laws of the Colony of New York, 1664–1719, vol. 1, p. 111.) By a subsequent statute passed soon afterwards by the same legislature a levy "by extent on the defendant's lands or against the defts goods and chattels & for want thereof his person" was authorized. (Nov. 2nd, 1683, chap. 12, Laws of the Colony of New York, 1664–1719, vol. 1, p. 134.) While these colonial statutes seem to have sanctioned the *elegit,* it is probable, as already remarked, that in practice that writ was not used. The act of 5 Geo. II, c. 7, which was applicable to the "Plantations and Colonies in America," provided that after September 29th, 1732, the lands of the debtor "shall be liable to and chargeable with all just debts, etc." This statute was intended to enable British subjects in England to sell real estates on execution in the colonies in order to satisfy the debts due to them. It received a liberal construction which extended it to all judgments. (*Catlin* v. *Jackson,* 8 John. R. 520, at p. 547.) Under this statute the *fieri facias* was the appropriate writ under which the lands could be sold, but in several essentials the effect of the execution was necessarily different from a *fieri facias* levied upon personal property only. (*Catlin* v. *Jackson, supra,* at p. 547; *Hanson* v. *Barnes' Lessee,* 3 Gill & John. Rep. [Md.] 359, 367.)

By the act of 1774 (Laws of the Colony of New York, 1769–1775, vol. 5, p. 637) provision was made for docketing the judgment in the name of the person against whom the judgment was entered, and it was declared that a judgment "not Docketed and entered in the Books" should not affect lands as to purchasers or mortgagees, or have any preference against heirs, executors or administrators. In 1787 (Laws of New York, 1785–1788, vol. 2, ch. 56, p. 467) and in 1801 (Laws of

1801, ch. 105) these provisions were substantially re-enacted. These statutes provided that the land of the debtor should be subject to sale in the same manner as his personal property, and made provision for the docketing of the judgment, and provided that a judgment not docketed should not affect lands as to purchasers or mortgagees. Whether the legal effect of these statutes was to make the judgment itself a lien upon the real estate of the debtor it is not necessary to determine. In *Koning* v. *Bayard* (14 Fed. Cas. No. 7924), decided in 1829, it was held that such was their legal effect. The first statute to specifically declare that "the said judgment shall be a *lien* on such lands, etc.," was the Revised Laws of 1813 (Vol. 1, ch. 50, p. 501). By that statute it was enacted "That all and singular the lands, tenements, and real estates, of any person against whom any judgment shall have been obtained in any court of record, for any debt, damages, costs or other sum of money, shall be subject to be sold upon execution to be issued upon such judgment, *and the said judgment shall be a lien on such lands, tenements, and real estates :* Provided, etc." This statute also provided that a judgment not docketed should not affect any lands and tenements *as to purchasers and mortgagees.* This statute has been several times re-enacted, amended and amplified (2 R. S. part 3, ch. VI, title 4, art. 2, sections 11 and 12, and Laws of 1840, ch. 386), and the substance of it is expressed in the present provisions of the Code of Civil Procedure relating to this subject. (See sections 1250 and 1251 of the Code of Civil Procedure.)

By virtue of the statutory changes which have been made in relation to this subject a judgment upon being filed and docketed becomes a lien upon the real estate of the debtor. It is no longer necessary that an execution should be issued upon the judgment in order to cause the judgment to become a lien upon real estate. *Adams* v. *Dyer (supra)*, decided in 1811, and *Waterman* v. *Haskin*, decided in 1814, had under consideration judgments

that were docketed prior to the enactment of chapter 50 of the Revised Laws of 1813. At the time these two cases were decided the legal effect of the statutory change that had taken place had not been determined. *Waterman* v. *Haskin* (*supra*) was decided solely upon the supposed authority of *Adams* v. *Dyer* (*supra*), and the short opinion that was rendered in *Adams* v. *Dyer* ignored the question whether any statutory change had been made. Whether this was because the judgment itself was not deemed a *lien* prior to the statute of 1813, and the judgments under consideration in these cases were entered prior to the passage of that act, it is needless to speculate.

Of course it is true that if the judgment actually became a lien upon the land it can make no difference whether it is a lien by virtue of express statutory enactment or by necessary implication from other language used in the statute. It is, however, a significant fact that at the time *Adams* v. *Dyer* (*supra*) and *Waterman* v. *Haskin* (*supra*) were decided it was an open and undecided question in this state whether the lien attached upon the filing of the judgment or whether subsequent action by way of execution must be taken in order to cause the lien to attach. It was not until more than fifteen years after these cases were decided that it was first held in *Koning* v. *Bayard* (*supra*) that under earlier statutes by implication the judgment became a lien from the date of filing. Even after this decision, as Judge BRONSON pointed out in *Wood* v. *Colvin* (*supra*), the effect of the statutory provision was not fully appreciated by judges and lawyers. The fact that this question was undetermined when *Adams* v. *Dyer* (*supra*) and *Waterman* v. *Haskin* (*supra*) were decided, and that it was not determined until subsequent statutory enactments had made the original legislative purpose clear, explains why the court in these cases assumed that the rule prevailing as to the acquisition of a lien upon personal property also prevailed as to real property and accorded a

# 440 HULBERT v. HULBERT.

preference to the judgment creditor, first taking proceedings by way of execution. The statute has now removed any doubt that may have existed on the subject and declared that the lien attaches as to land from the filing of the judgment. Under these circumstances the ruling in *Adams* v. *Dyer* (*supra*) and *Waterman* v. *Haskin* (*supra*) should not be so applied as to make the unnecessary act of issuing an execution the ground for according, as between creditors of equal rank, to one creditor a priority over another. To so apply these decisions is to fail to give effect to the existing statutory provisions on this subject.

Whatever the legal effect of the early statutes may have been it is perfectly clear that since 1813 the judgment itself is a lien upon the real property of the debtor. The legal effect of this statutory rule is that from the moment a judgment is duly filed and docketed legal rights in the real estate of the debtor attach. In the case now under consideration the liens of the three judgments attached simultaneously to the property of Hulbert upon his acquisition of the interest derived from his father. By virtue of the statute they were at that time equal liens entitled to share *pro rata* in the proceeds of the debtor's property. Such being the case, how can it be held that the issuing of the execution and the advertising by the sheriff — acts which would be an idle ceremony — should give a preference to the creditor? Once a lien is acquired it is a right which cannot be lost by the performance of an unnecessary act by another creditor. With as much reason could it be held that as between two mortgagees holding mortgages of equal rank, the one who showed the greatest diligence in commencing an action of foreclosure should acquire a preference over the other. Under the terms of the statute the judgments of the appellants became liens on the real property of Hulbert of equal rank with the lien of the judgment of the St. Paul's Church. The lien of these judgments of the appellants, having attached, did

not forfeit their position of equality and become subordinate to a lien of equal rank, merely because its owner did not do a useless thing. In *Rankin* v. *Scott* (25 U. S. 177, 179) Chief Justice MARSHALL said: "The principle is believed to be universal, that a prior lien gives a prior claim, which is entitled to prior satisfaction, out of the subject it binds, unless the lien be intrinsically defective, or be displaced by some act of the party holding it, which shall postpone him in a court of law or equity to a subsequent claimant. The single circumstance of not proceeding on it until a subsequent lien has been obtained and carried into execution, has never been considered as such an act." The diligence of a junior judgment creditor could not affect the lien of a senior judgment creditor, and if it could not affect the lien of a senior judgment creditor, it cannot affect the lien of equal rank. The principle that equity favors the diligent has no application where one creditor displays his diligence in the doing of useless and unnecessary things. The liens of the three judgments attached when Hulbert acquired the property. The issuing of an execution upon one of the judgments could not affect the relative rank of the liens as between themselves. It is urged that, although this reasoning was adopted in *Rockhill* v. *Hanna* (4 McLean, 554), where the court refused to follow *Adams* v. *Dyer* (*supra*) and *Waterman* v. *Haskin* (*supra*), that case was not followed in the United States Supreme Court. In *Rockhill* v. *Hanna* (56 U. S. 189, 196) the United States Supreme Court considered the question presented in *Rockhill* v. *Hanna* (4 McLean, 554) and intimated an opinion in accord with the rule declared in *Adams* v *Dyer* (*supra*) and *Waterman* v. *Haskin* (*supra*), but the decision of the court was not placed on that ground, the court saying: "But we do not think it necessary to rest the decision of this case, merely on the question of diligence, or to decide whether this doctrine has been finally established as the law of Indiana. The

plaintiff's lien does not, by the statement of this case, stand on an equality as to date with that of the other judgments. By electing to take the body of his debtor in execution he has postponed his lien, because the arrest operated in law as an extinguishment of his judgment."

Under the circumstances disclosed, and in view of the fact that *Adams* v. *Dyer* (*supra*) and *Waterman* v. *Haskin* (*supra*) declare a rule contrary to our existing statute we feel compelled to hold that these decisions are no longer controlling upon us and that we should give effect to the rule declared in the statute.

The order appealed from should be modified by directing that the fund now deposited in court should be distributed *pro rata* between the three judgments, and as so modified the order should be affirmed, without costs to either party.

WILLARD BARTLETT, Ch. J. (dissenting). I dissent from the judgment about to be rendered in this case. I think it is in conflict with the established law of this state as it has existed for more than a century. It squarely overrules two decisions of our old Supreme Court, the doctrine of which has been adopted in other states and approved by the Supreme Court of the United States; and this without any change in conditions which in my opinion suffices to justify such action.

In the present case, three judgments stood duly docketed in Seneca county against the defendant Hulbert, when, in 1910, upon the death of his father he inherited a one-third interest in the real estate sought to be partitioned in this action. The three judgments thus simultaneously became liens upon the property so acquired by the judgment debtor. (*Matter of Hazard*, 73 Hun, 22; affd., on opinion below, 141 N. Y. 586.) Prior to the commencement of the partition suit, and pursuant to leave of court, duly granted, an execution against the property of the defendant Hulbert had been issued to the

sheriff of Seneca county, on one of the three judgments which was in favor of St. Paul's Church of Waterloo, N. Y.; and the sheriff subsequently sold the judgment debtor's interest in the real estate inherited from his father to the respondent William F. Bacon. The question presented by this appeal is whether St. Paul's Church acquired a preference for its lien over the liens of the other two judgments by the steps which it had taken to enforce its judgment — to wit, the issue of an execution and causing the property to be advertised for sale thereunder.

The courts below have held, without dissent, that the judgment in favor of St. Paul's Church had thus become entitled to priority.

The leading cases relied upon as authority for this decision — which it is now proposed to reverse — are *Adams* v. *Dyer* (8 Johns. 347) and *Waterman* v. *Haskin* (11 Johns. 228), both decided by the old Supreme Court, the former in 1811, when Kent was chief justice and the latter in 1814 when Kent had become chancellor and had been succeeded as chief justice by Smith Thompson, who subsequently became an associate justice of the Supreme Court of the United States. With them on the bench were such men as Ambrose Spencer, William W. Van Ness and Joseph C. Yates; so that the judicial ability of the court can hardly be questioned by New York lawyers. They decided that where judgments were equal as to the date of the lien, the issue of execution upon one of the judgments, the advertisement of the lands for sale thereunder and the sale thereof by the sheriff entitled the plaintiff in that judgment to have his claim first satisfied out of the property. In the second case it was held to be enough to establish the priority of such a judgment that the sheriff who received the execution thereon had begun to execute the process first; he "thereby turned the scale of equal right and gained a priority by his vigilance." (*Waterman* v. *Haskin, supra.*)

That the doctrine of these cases and cases to the same effect in other states has been regarded as establishing the law generally in accordance with the rule therein laid down appears from the statements by the leading text writers and in the American and English Encyclopædia of Law.

"If two or more judgments, on account of their contemporaneous rendition or docketing, or from any other cause, are equally entitled to precedence as liens on the real estate of the judgment debtor, this equality may be destroyed, in order to give precedence to the lien holder who first attempts to subject any specific real estate to the payment of his lien." (2 Freeman on Judgments [4th ed.], section 374.)

In Rorer on Judicial Sales, section 703, the author states the rule thus: "If several judgment creditors have judgments of equal date, and their judgments are in law all liens on the real estate of the same defendant, the one that levies thereon first obtains priority."

In the American and English Encyclopædia of Law (2d ed., vol. 17, p. 796) we find: "It may be laid down as a general rule that where liens of judgment are equal, one judgment creditor may acquire a priority over another by superior vigilance in executing his judgment. Thus in some cases it has been held that when judgments in favor of different persons and against the same defendant are rendered or recorded on the same day, the judgment creditor first issuing execution and levying upon the debtor's property acquires a prior right to satisfaction. And the same rule has been applied to judgments rendered at the same term where by statute such judgments are made equal liens on the defendant's real estate."

I make these quotations simply to show that the doctrine of priority by execution where the judgment liens are equal is not a peculiarity of New York jurisprudence. I will cite a few cases from other jurisdictions in which it has been adopted and applied.

HULBERT *v*. HULBERT. **445**

1916.]   Dis. opinion, per WILLARD BARTLETT, Ch. J.   [216 N. Y.]

The case of *Elston* v. *Castor* (101 Ind. 426) resembles the present case in the fact that the judgment debtor became the owner of the lands in controversy after the rendition of the several judgments against him. These previously existing judgments, therefore, became equal liens on the land; but it was held that the one of the holders of such liens who first caused execution to be issued and levied on such land obtained a lien which was superior to that of the other judgments. The *rationale* of the doctrine is thus explained in the opinion: "Judgments are liens upon the real estate of the judgment debtor because the statute makes them such. This lien is given for the purpose of collection. Mr. Freeman says: 'A judgment is not a specific lien on any particular real estate of the judgment debtor, but a general lien upon all his real estate, subject to all prior liens, either legal or equitable, irrespective of any knowledge of the judgment creditor as to the existence of such liens.' 'In short a judgment creditor has no *jus in re*, but a mere power to make his general lien effectual by following up the steps of the law and consummating his judgment by an execution and levy on the land.' § 338. And so it was said in the case of *Gimbel* v. *Stolte* (59 Ind. 446, 451) distinguishing a mortgage and judgment lien. 'There can be no doubt that a law which gives a judgment creditor a lien on the real estate of the debtor, relates solely to the remedy.' When the liens are thus equal, and one of the judgment creditors first pursues the remedy and exercises the power of making his lien effectual by following up the steps of the law by an execution and levy, he thereby makes his consummated lien superior, which until then was but equal."

To the same effect is *Smith* v. *Lind* (29 Ill. 24) where the court said: "While the lien was made equal, diligence was left to its reward. Under the general law the lien of judgments is equal, but the vigilant creditor can acquire a preference in the payment of his judgment by

first issuing his execution. If one creditor who is precisely equal to another in point of lien shall get an advantage by the use of superior diligence in discovering property, making a levy and sale of it, where is the hardship or injustice?"

In *Bruce* v. *Vogel* (38 Mo. 100, 106) the Supreme Court of Missouri followed the rule in *Adams* v. *Dyer (supra)*, saying: "While the statute makes the liens equal, it does not deprive a party of any advantage he may gain by the exercise of superior diligence. If one creditor who is exactly equal to another as regards liens, by energy, perseverance and diligence, discovers property whereon to levy and make his money, justice demands that he shall reap the fruits of his industry. He may have gone to great labor and expense in investigating records and ferreting out and bringing to light property out of which to satisfy his execution; and to allow another person who had slept on his rights, and neither encountered labor or furnished money, to stand on an equality with him, would be inequitable. ' *Vigilantibus, non dormientibus, jura subveniunt.*' The laws assist those who are vigilant, not those who sleep over their rights. We are well satisfied, on principle, that where judgment liens are equal, one judgment creditor can get priority over another by his superior vigilance and watchfulness. The execution issued on the judgment rendered in favor of Brown was fairly entitled to priority, as it was first placed in the hands of the officer, and the levy and sale were made under it; and the money could not be diverted from it and applied to others subsequently issued, and under which there was neither levy nor sale."

In *Bliss* v. *Watkins* (16 Ala. 229), decided in 1849, the Supreme Court of Alabama said: "It seems to be well settled in New York, where judgments constitute a lien upon land, that where two judgments are rendered on the same day, although neither judgment creditor has the preference as a lien, yet if one of the creditors first take

out execution, and proceed to levy and sell, his execution must be first satisfied, by reason of his superior diligence although the other creditor put his execution in the hands of the sheriff before the sale. (Citing *Waterman* v. *Haskin, supra,* and *Adams* v. *Dyer, supra.*) * * * Where the liens created by the judgments are equal, the money should be awarded to the creditor who first begins execution of his judgment. There is nothing unreasonable in this, and it is but carrying out the spirit of our statute in respect to the subject of lien. It is giving the priority to the most vigilant, as is done by the statute in respect to personal property, which gives the preference to the party who first places his *fi. fa.* in the sheriff's hands, although it may have issued upon a junior judgment."

In Iowa it is held that where judgments are entered on the same day, and become liens against the real estate of the judgment debtor, the judgment debtor who first issues execution and sells, obtains a preference (*Lippencott, Johnson & Co.* v. *Wilson,* 40 Iowa, 425), but the courts of that state make a distinction as to after-acquired property. It is held that under such circumstances a different rule prevails and that the issuance of execution and the sale do not give a preference. No reason for the distinction is stated except that the two cases do not come within the same rule. (*Kisterson* v. *Tate,* 94 Iowa, 665.) I am unable to perceive any difference in principle.

This review of the development of the rule asserted in the cases of *Adams* v. *Dyer* (*supra*) and *Waterman* v. *Haskin* (*supra*) indicates that it is rather firmly imbedded in our general jurisprudence. On what ground is it proposed to overrule these time-honored authorities, the doctrine of which appears now for the first time to be questioned in this state? As I understand the prevailing opinion it is simply because the judgments under consideration in the *Adams* and *Waterman* cases were docketed prior to the enactment of chapter 50 of the Revised Laws of 1813 which contained the first *express* declara-

tion that a judgment should be a lien on land. It is per-
fectly clear, however, that the judgments considered in
these two cases *were* liens upon the lands of the judg-
ment debtor. In the first place in each case the court
said so. I quote: "We must then consider the judg-
ments equal as to the date of the *lien,*" etc., etc. (*Adams*
v. *Dyer, supra.*) "By the second section of the act con-
cerning judgments and executions passed the 31st of
March, 1801, a judgment lien attaches upon the time of
filing the record of judgment." (*Waterman* v. *Haskin,*
*supra.*) While it is quite true that under the statutes
then in force judgments were not expressly declared to
be liens upon real estate, those statutes necessarily
implied that such was the law. The phraseology of the
act of 1801 referred to in the *Waterman* case was sub-
stantially the same as that of the act of 1787 considered
by the Circuit Court of the United States in *Koning* v.
*Bayard* (14 Fed. Cases, 843), decided by Mr. Justice
SMITH THOMPSON, sitting as circuit justice in 1829; and
he held that the declaration in the act of 1787 that no
judgment should affect land but from the time of the
filing of the roll and the docketing of the judgment
necessarily implied that upon that being done the judg-
ment should affect the land and was equivalent to say-
ing that it should then become a lien.

If a judgment actually is a lien upon land I cannot
see what difference it can possibly make whether it has
become a lien by reason of an express statutory declara-
tion to that effect or by reason of necessary implication
from other language used in the statute. If, as was
virtually held in the case last cited, the declaration in
the Revised Laws of 1813 merely expressed what had
been necessarily implied before, I cannot comprehend how
the enactment of the later statute can be regarded as
furnishing any basis for the distinction made in the
prevailing opinion.

One of the main purposes for which this court exists is

to preserve the harmony and consistency of judicial decisions, finally determining the rights of litigants; and this can only be done by maintaining a due regard for precedents. If we overrule these two precedents, it seems to me that we warn counsel and the lower courts that they can no longer rely on authority to guide the former in giving advice or the latter in rendering decisions. If the lapse of time or later statutory enactments had brought about changed conditions which required us to take a different view from that taken by the old Supreme Court, I might agree with my brethren; but I can discover no change which affects the principle on which those cases were decided.

For these reasons I dissent and vote for the affirmance of the final order appealed from without modification.

CHASE, COLLIN and HOGAN, JJ., concur with SEABURY, J.; CUDDEBACK and POUND, JJ., concur with WILLARD BARTLETT, Ch. J.

Order modified, etc.