FRANK GROSVENOR SMITH *v.* ANNA C. FORD.

(*June* 3, 1932.)

PENNEWILL, C. J., RICE, HARRINGTON, RICHARDS and RODNEY, J. J., sitting.

*George B. Pearson* for plaintiff.

*William H. Foulk* for defendant.

Superior Court for New Castle County, No. 256, March Term, 1932.

RODNEY, J., delivering the opinion of the Court:

We shall consider the questions in the same numerical order as suggested in the statement of facts.

■ 1. It is apparent from the statement of facts and other papers filed in the case that Edward J. Flynn received no preference over the other creditors; that personal estate and proceeds of the sale of real estate sold by order of the

Orphan's Court seemed to have been sufficient to discharge all debts having priority to the judgment of Flynn under which the land was sold. The value of the land sold and all other facts of the case impel the conclusion that no preference occurred or could have occurred in the manner of the sale and that the additional costs of preferring a separate petition in the Orphan's Court for the sale of this small lot was unnecessary.

2. There yet remains the most important and interesting question for determination. Can lands be sold under an execution for the payment of debts by a writ of *fieri facias* under the laws of the State of Delaware? The answer to this question is made more clear and definite by a consideration of the progressive state of our statutory law upon the subject, for upon this law the matter is solely based. It is entirely clear that at common law real estate (as distinguished from chattels real) was not liable to be taken in execution and sold for the payment of private debts.

This principle and policy, however, was not suited to the genius of our early settlers and when William Penn first received his patent for the Province of Pennsylvania, this matter of the liability of lands for the payment of debts received immediate attention. A number of laws were agreed upon in England prior to Penn's departure for America and among these, the fourteenth, provided "that all lands and goods shall be liable to pay debts, except where there is legal issue and then all goods and one-third of the land only."

It would avail but little to trace the statutory changes bringing about the more complete subjection of real estate for payment of debts. The one-third of the real estate originally made liable was increased to one-half of the real estate at the first Assembly in 1682, when the Province of Pennsylvania was by Act of Union joined to the Three Lower Counties now constituting the State of Delaware,

and six years later all of the real estate was made subject to execution with the provision that the main house or plantation of the defendant could not be sold until one year after the judgment obtained and should be the last property to be sold.

Chief Justice Gilpin in *Flanagin v. Daws, 2 Houst.* 476, at *page* 492, has made a partial study of this development of statutory law although subsequent publications have made available sources of information unknown to him.

While from the earliest settlement of our State, lands were made liable for the payment of debts, yet the actual method of procedure is not entirely clear owing to our ignorance of the exact wording of the early laws.

In 1732 there was passed in England the *Act of 5, George II, Chapter* 7, which was applicable only to the English Colonies and which made lands subject to the sale for payment of debts. It has been said that lands under this act were sold under the writ of *fieri facias. Hulbert v. Hulbert,* 216 *N. Y.* 430, 111 *N. E.* 70, *L. R. A.* 1916*D,* 661, *Ann. Cas.* 1917*D,* 180; *Duvall v. Waters,* 1 *Bland (Md.)* 569, 18 *Am. Dec.* 369; *Jones v. Jones,* 1 *Bland (Md.)* 443, 18 *Am. Dec.* 327; *Catlin v. Jackson,* 8 *Johns. (N. Y.)* 520.

Whatever may have been the situation in New York, Maryland or other Colonies we have found no evidence whatever that this Act of 1732 ever applied to or was in force in our State. Upon the contrary, at almost precisely the same time there was passed by our Colonial Assembly an Act which has furnished the basis of all subsequent legislation upon the subject and the foundation of our practice.

During the administration of Governor Patrick Gordon between the years of 1726-1736, an Act was passed for taking lands in execution for the payment of debts. This appears in the first *Codification of Laws* in 1741, *page* 55; *Code* 1752, *page* 79; *Vol.* 1, *Laws of Delaware,* 109, and in the *Revised Code* of 1829, at *page* 204.

*Section* 2 provided that

"It shall not be lawful for any Sheriff or other Officer by virtue of any execution of any writ or writs thereupon to sell or expose to sale any such lands, tenements or hereditaments in this Government which shall or may yield yearly rents and profits, beyond all reprises, sufficient within the space of 7 years to satisfy or pay such debts or damages with the cost of suit; but that all those lands, tenements and hereditaments shall by virtue of the writ or writs of execution be delivered to the party obtaining the same until the debt and damages be levied by a reasonable extent in the same method and manner as lands are delivered upon writs of *elegit* in England."

*Section* 3 provided that if the clear profits of lands should not be found sufficient to pay the debt within seven years that such return should be made by the Sheriff upon the writ of execution and that the lands could then be sold upon a writ of *venditioni exponas.*

In the *Code* of 1852 all of the statutory provisions regulating the seizure and sale of real estate were rewritten and codified with other provisions concerning *elegit.* The language of the earlier statutes was somewhat changed, but the procedure and general requirements were essentially the same.

These provisions of the Act of 1852 were continued through the intermediate years and included in the *Revised Code* of 1915 and were in force in 1925 when the amendatory act forming the basis of the present controversy was enacted. The effect of all the statutory provisions was that while land was made liable for the payment of private debts yet such land could not be sold upon the judgment obtained until after the land had been levied on, an inquisition held and it was determined whether or not the yearly rents and profits of the land would pay the debt within seven years. *Lore's Lessee v. Hambleton,* 2 *Harr.* 474; *Gordon v. Rankin,* 2 *Harr.* 476, note. If the rents and profits would so pay the debt, then the land could not be sold but was taken by the plaintiff in the execution under the writ of *elegit;* if the rents and profits were not sufficient to so discharge the debt, the property

was condemned and upon this showing a writ of *venditioni exponas* was issued and the lands were sold. The statutes and practice of Pennsylvania, based upon the Act of 1705, bear a marked similarity to our own. The Pennsylvania Act of 1836, however, provides that the defendant in the execution (if the owner of land at the issuance of the execution) could in writing waive the inquisition and in such case the land could be sold under the writ of *fieri facias*. *Pa. Stat.* 1920, § 10463 (12 *PS*, § 2383) ; *Levy v. Spitz*, 297 *Pa.* 136, 146 *A.* 548. Without inquisition or waiver of inquisition the lands could not be sold. *Baird v. Lent*, 8 *Watts* (*Pa.*) 422.

In Delaware there never was statutory authority for the waiver of the inquisition. While it has been held that the defendant could waive the right to have personalty sold before the sale of land (*Springer's Adm'x v. Johnson*, 3 *Harr.* 516) yet it has also been held that (the defendant objecting) there could be no inquisition on lands until the sale of the personalty. *Wilson's Adm'r v. Hukill*, 1 *Harr.* 347.

The case of *Cloud v. Lore*, 5 *Houst.* 163, is not easy to understand. There, upon a *fi. fa.*, the defendant in the execution, stated in writing

"I, * * * hereby waive the seizure and sale of my personal property under this writ, and do expressly consent that the sheriff of New Castle County shall levy upon my real estate and proceed without inquisition to sell the same in satisfaction of the within writ."

The Court set aside the sale, the report simply reading "because the land could not be sold on the *fi. fa.* under the waiver even without a writ of *venditioni exponas*, at least, for that purpose." It is probable that the Court felt that before the Sheriff could be authorized to sell the land that a return would have to be made upon the *fi. fa.* and before the selling writ for the real estate could issue that an inquisition must have been held or a waiver of it (even if such waiver could have been made) must have been made

a part of the records of the Court. The Court naturally looked to the writ of *venditioni exponas* as the selling writ for the real estate.

Because under the Delaware statutes and practice lands could not be sold under execution proceedings until after a levy made upon it by writ of *fieri facias* and condemnation of the land by inquisition, so the logical way to enforce the sale of the land was by writ of *venditioni exponas*.[1] This writ of *venditioni exponas* was never a writ of authority. It was always a writ of compulsion. 1 *Freeman on Executions* (3d Ed.), § 58; 23 *Corpus Juris* 618; *Clarke v. Belmear*, 1 *Gill & J.* (*Md.*) 443, at *page* 448.

It originated when goods and chattels were the only property subject to execution and was made use of when the officer failed to sell the goods and chattels levied on under the writ of *fieri facias* under which the levy had been made. The writ of *venditioni exponas* recited (and our writ still recites) the issuance of the *fieri facias* and the levy thereunder and directs the sale pursuant to the levy. As lands became available for the payment of debts the writ of *venditioni exponas* became the natural writ of compulsion because no sale could take place under the *fieri facias* by reason of the fact of the necessity of the subsequent inquisition. Since the Legislature has abolished the inquisition and all statutory provisions relating thereto no sufficient reason appears to exist which would prevent the sale

---

[1] Many cases appear in the early records of both New Castle and Sussex Counties, at least, where the personal property of the defendant was first seized and sold under a *fieri facias* and at a subsequent date but before the return of the writ his lands were also seized and levied on and an inquisition held under a thirty day rule (*Section* 4342, *Revised Code* 1915).

The writ was then returned and the lands in question sold on a *venditioni exponas* issued to a subsequent term. This practice of seizing real estate after the seizure and sale of the personal property levied on, but before the return of the writ, would seem to be consistent with the statutory provision: "Lands, tenements and hereditaments, where no sufficient personal estate can be found, may be seized and sold upon judgment and execution obtained." *Section* 4320, *Revised Code* 1915.—Ed.

of the lands upon the writ of *fieri facias*. Goods and chattels have always been sold under said writ of *fi. fa.* when time would permit before the return day of the writ. There is no essential, no peculiar, content in the writ of *venditioni exponas* making it the exclusive means for the sale of land even in execution process. Since 1726 there has existed the statute now appearing as *Section* 4358 of the *Revised Code of* 1915 which provides that where the land is unimproved and yields no yearly profit that such land could be sold under the writ of *levari facias* with or without any writ of *venditioni exponas*. The writ of *venditioni exponas* takes its authority from the preceding writ of *fieri facias* and is in effect a branch and continuation of it. *Hughes v. Rees,* 4 *M. & W.* 468, 150 *Eng. Reprint* 1513; *Neil v. Colwell,* 66 *Pa.* 216; *Doe v. McLeod,* 3 *U. C. Q. B.* 297; 39 *Cyc.* 1128.

It simply commands that to be done which could not be done under the *fieri facias* by reason of the shortness of the time before its return or which was impossible under the *fieri facias* by reason of the necessity of subsequent proceeding such ·as inquisition.[1] The writ of *fieri facias* in Delaware always directed the Sheriff to make the debt due to the judgment creditor from the, "goods and chattels, lands and tenements" of the defendant.

██ ██ We are of the opinion, therefore, that a sale of lands may be had under certain circumstances upon the writ of *fieri facias*. If, by the shortness of the time for return, sale cannot be made under the writ of *fieri facias* then the writ of *venditioni exponas* as a writ of compulsion is still available for the sale of such goods or chattels or for lands under the provisions of *Section* 4356 of the *Revised Code* which has not been repealed. We are, of course, aware of the excellent treatment by Judge Woolley of the subject of executions. His book has long been the

---

[1] Differing from the old English practice a *fi. fa.* for the residue cannot be incorporated in a writ of *venditioni exponas. Fiddeman v. Biddle,* 1 *Harr.* 500, 503.

guiding star of Delaware Practice. Written before the Amendatory Act of 1925 and before the repeal of all requirement of inquisition and *elegit* the statements that a *fieri facias* was never a selling writ of realty and that a writ of. *venditioni exponas* was necessary in the sale of lands, must of course, be subject to statutory changes.

█ 3. *Section* 4359 of the *Revised Code* provides that goods and chattels could not be sold under execution by the Sheriff until the expiration of thirty days after the levy made thereon. There being no statutory requirement that any specific time should elapse between the date of the levy on the lands and the date of the sale, we are, of course, powerless to require such interval.

We are of the opinion that title to the lands and premises mentioned in the agreed statement of facts is a marketable one insofar as it is affected by the questions raised by the agreed statement of facts and direct that this opinion be certified. to the Superior Court in and for New Castle County.