In the matter of Lucio F. RUSSO, Bankrupt.

Avery J. GROSS, as Trustee in Bankruptcy of Lucio F. Russo, Bankrupt, Plaintiff,

v.

Lucio F. RUSSO, Bankrupt, Defendant.

Bankruptcy No. 78 B 22.

United States Bankruptcy Court, E. D. New York.

Feb. 12, 1980.

Avery J. Gross, Staten Island, N. Y., Trustee pro se, for plaintiff.

Robert W. Tauber, Brooklyn, N. Y., for defendant.

MANUEL J. PRICE, Bankruptcy Judge.

This is an adversary proceeding brought by the trustee in bankruptcy, "THE TRUSTEE," of Lucio F. Russo, "THE BANKRUPT," pursuant to Rule 701(4) of the Rules of Bankruptcy Procedure, "THE RULES," to deny the bankrupt's discharge on two grounds:

1. That he destroyed and failed to keep or preserve books of account or records from which his financial condition and business transactions might be ascertained within the meaning of Section 14c(2) of the Bankruptcy Act, "THE ACT," 11 U.S.C. § 32c(2), and

2. That he failed and refused to obey lawful orders of this court which required him to turn over to the trustee certain records, within the meaning of Section 14(c)6 of the Act.

The bankrupt interposed an answer in which he denied both charges and the case proceeded to trial on September 17, 1979. [Since there were morning and afternoon sessions, I shall refer to the transcript of the morning session as "Tr., A.M." and the transcript of the afternoon session as "Tr., P.M."]

At the trial, the trustee, an attorney, appeared *pro se*. He was the only witness for the plaintiff and presented his case principally by reading into the record testimony elicited from the bankrupt at his examination during the first meeting of creditors and from subsequent examinations conducted by him pursuant to Rule 205 of the Rules. The bankrupt was the only witness called on his behalf.

The following is a resumé of the facts which were adduced at the trial.

The bankrupt, an attorney admitted to the bar of the State of New York, who had been engaged in practice for over forty years, (Tr., P.M., p. 31, l. 25), filed a voluntary petition in bankruptcy on January 5, 1978. In accordance with Section 18f of the Act, 11 U.S.C. § 41f, the filing acted as an adjudication, which, in turn, acted as an application for a discharge pursuant to Section 14a of the Act, 11 U.S.C. § 32a. In addition to his law practice, the bankrupt had been elected to the New York State Assembly in which he served for twenty-two years, from January 1, 1953 to December 31, 1974 (Tr., P.M., p. 32, ll. 4–8). During his service in the Assembly, he was named Chairman of the Insurance Committee from 1963 to 1969 and of the Banking Committee from 1969 to 1974 (Tr., P.M., p. 32, ll. 9–14).

At the first meeting of creditors, the trustee was elected pursuant to Section 44a of the Act, 11 U.S.C. § 72a, and Rule 209(a) of the Rules and he duly qualified as such. He proceeded to examine the bankrupt during the adjourned first meetings and the examinations which he conducted pursuant to Rule 205(a) and (f) of the Rules. During the course of these examinations, this court, by verbal and written orders, directed the bankrupt to turn over to the trustee all of his books, records, cancelled vouchers, bank statements, checkbook stubs, tax returns and any other documents pertaining to his financial transactions and business dealings. In response to these directions, he turned over to the trustee the bank statements and cancelled vouchers, on his personal checking account, for the period from 1972 through 1977 (Plaintiff's Exhibits 3 and 7), payment books issued by banks from which he had obtained seven loans, copies of his federal

income tax returns for 1975 through 1977 (Plaintiff's Exhibit 4) and an affidavit describing, in part, how he had disposed of two checks, totaling over $17,000, issued to him in 1974 by the New York State Pension System (Defendant's Exhibit A). He turned over no checkbook stubs or other records which might have indicated the source of deposits into his bank account nor did he turn over any books or ledgers in which he might have recorded the receipts from his law practice and from consulting fees received by him from the Legislature of the State of New York and the disbursements incident thereto.

The trustee contends that the bankrupt's discharge should be denied pursuant to Section 14c(2) and (6) of the Act, 11 U.S.C. § 32c(2) and (6), since he has failed to keep or preserve books and records from which his financial condition and business transactions might be ascertained and that he has failed to obey the lawful orders of this court, particularly the order signed on March 22, 1978 (Plaintiff's Exhibit 1) which directed him to turn over to the trustee, *inter alia*, "cancelled checks, bank statements and *checkbook stubs . . . and all other records used by the bankrupt to record income*." (emphasis added).

Subdivisions (2) and (6) of Section 14c provide:

"c. The court shall grant the discharge unless satisfied that the bankrupt has . . . (2) destroyed, mutilated, falsified, concealed, or failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained, unless the court deems such acts or failure to have been justified under all the circumstances of the case; or . . . (6) in the course of a proceeding under this Act refused to obey any lawful order of, or to answer any material question approved by, the court . . . ."

It is the bankrupt's contention that he has satisfied the requirements of both of these subdivisions of Section 14c. He argues that he has turned over to the trustee all of the records which he kept and that his financial condition and business transactions can be sufficiently ascertained from them. He alleges that he has complied with the court's direction to him since he simply never retained the checkbook stubs and that he never maintained any ledgers, books, or records other than those turned over to the trustee.

The first question to be determined is: Are the records turned over to the trustee sufficient to satisfy the duty imposed on the bankrupt to "keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained"?

It has been the bankrupt's position throughout these proceedings that no books of account ever existed, that he never kept or maintained any such records in all of his years in practice. He testified, that although the checks in his checkbook were attached to stubs, he did not record any information on them beyond that which appeared on the cancelled checks and bank statements (Tr., P.M., p. 17, l. 20–p. 18, l. 4) and, in any event, when he was finished with the checkbook he "disposed of it. [He] didn't know exactly what [he] did with it. [He] didn't intentionally destroy it." (Tr., P.M., p. 18, l. 25–p. 19, l. 1).

He also testified that the only other records with regard to his finances that ever existed were "notations" prepared by him at the end of each year for the purpose of assisting his accountant in preparing his income tax returns. He would send the sheets containing the "notations" to his accountant, who presumably kept them, for they were not returned to him and, if they had been, he would "dispose of [them]" (Tr., A.M., p. 18, l. 21–p. 20, l. 25).

He testified that even though he kept no ledger or other account book showing his receipts and disbursements, at the end of each year, in order to prepare these "notations", which were summaries of his income and expenses, he was able to reconstruct them for his accountant from his bank statements and cancelled checks because, he

pointed out, "when you're filing an income tax return, you're only talking about records from the year before and they were fresh in my mind so I was always able to determine at that time exactly what was income and what was (*sic*) expenses." (Tr., P.M., p. 21, ll. 16–19). However, by the time that his bankruptcy proceeding was commenced, he was no longer able to determine the source of his income as reflected in the deposits to his checking account as they appear in his bank statements. An example of his inability to do so appears in the transcript of an examination of the bankrupt conducted by the trustee on November 30, 1978. A portion of that transcript, read into the record of this action by the trustee, is as follows:

"'Question: For example, Mr. Russo, on the statement issued by the bank as of January 6, 1977, there is indicated that a deposit was made on December 14 in the sum of $580. You may take a look at it. Now, do you recall of your own recollection as to what the source of those funds was? Answer: I don't recall." (Tr., A.M., p. 17, ll. 18–24).

Another example of his inability to recall the source of deposits made to his checking account is illustrated by the following testimony elicited by the trustee at the trial:

"Q Well, Mr. Russo, you have testified on your direct testimony, that the manner in which you went about determining a total income for the year when you gave your figure to your accountant, was that you took all of these statements and you took all your deposits and subtracted from it your income from Albany and your lulus, as you described them. Would you care to take these statements and demonstrate to the Court?

"A I don't have to because I know what you're driving at. There were many deposits that are not actual deposits for example, if I went to Chemical Bank and lets (*sic*) say, I owe the Chemical Bank $5000 on a three month loan and they renew it, they put it in as a deposit again . . . The point is that *when I gave my accountant the figures, I knew these things* and I knew what was a loan and I could very well go to Manufacturers Hanover Trust and borrow $5000 and put it into my account, it doesn't mean that I earned $50,000 that year. It's as simple as all that, I would know that." (emphasis added). (Tr., P.M., p. 23, l. 19–p. 24, l. 16).

The trustee, with the records available to him, attempted to piece together the bankrupt's financial condition and business transactions. He described his efforts, and the result thereof, in the following testimony:

"The only correlation which I felt I could make based upon the records that were at my disposal was to attempt to correlate the deposits that went into the bank statements that are in evidence, with the sum totals that are reflected on the income tax returns. Annexed to, or placed together with the bank statements which have been marked into evidence for the three years immediately preceding the bankruptcy petition, that is, Exhibit 4, I have placed in the rubber band holding together the statements for each of those respective years, an adding machine tape in which I taped the total amount of the deposits that were deposited to the bank statement, these figures being taken from the total given by the bank on the statement for each month reflecting the total of deposits. I added those figures up for each year and then attempted to correlate those figures with the figures on the individual income tax returns, assuming for purposes of my inquiry that all of the monies that went into that bank account constituted income. But I found absolutely no correlation whatsoever. The figures derived by adding up all the deposits, I should say, all those unidentified deposits on the bank statements were absolutely no resemblance (*sic*) to the figures reflected to the gross income on the income tax returns that have been marked into evidence. I had no other

records, there were no other means of identifying the sources of the bankrupt's income. It could have been a whole lot more, a whole lot less than the amount that was reported on the returns and I would have no way of knowing."

(Tr., A.M., p. 35, l. 24–p. 37, l. 8).

A comparison of the bankrupt's gross income, as reported in his income tax returns for 1975, 1976 and 1977, with the total deposits made to his checking account, as reflected in his bank statements for the corresponding years, yields results which support the trustee's conclusion.

The bankrupt's income tax return for 1975 (Plaintiff's Exhibit 4) reflects four sources of income: $11,825 from New York State, evidently for consulting services rendered, pension income from New York State of $12,497, gross receipts of $6,350 from his law practice, and interest income of $1,294. These figures add up to total receipts of $31,966. However, in the same year he deposited $52,174.66 into his personal checking account (Plaintiff's Exhibit 3). This discrepancy is compounded by the fact that he testified that he usually deposited his pension checks into his wife's checking account and not into his. (Tr., P.M., p. 27, ll. 3–17).

A similar pattern arises from a comparison of the bankrupt's 1976 tax return (Plaintiff's Exhibit 4) with his gross deposits for that year. (Plaintiff's Exhibit 3). The 1976 tax return shows gross receipts of $14,175 for consulting work performed for the New York State Legislature, pension income of $12,497, $7,850 from his law practice, and interest income of $1,325. These figures add up to $35,847. His checking account, however, shows total deposits of $45,738.93, a discrepancy again increased by taking into consideration his testimony that he usually deposited his pension checks into his wife's account.

The bankrupt's 1977 gross receipts are considerably closer to his total deposits. His tax return for that year shows receipts of $12,000 for consulting work performed for the New York State Legislature, pension income of $12,497, $3,100 from his law practice, and $1,050 in interest income. These figures add up to $28,647. His total deposits in 1977 were $27,673.48. If we again consider his testimony that he usually deposited his pension checks into his wife's account, these figures also show an excess of deposits over reported income.

Taken together, these figures pose serious questions concerning his financial condition and what his actual income was during those years. When asked about the large amount of unexplained deposits reflected in his 1975 bank statements, he states: "They're (*sic*) loans in there. Many loans and the banks put in, if you renew a loan at the bank, they put it in as a deposit." (Tr., P.M., p. 23, ll. 16–18). He also alluded to the possibility that his wife might have furnished him with funds which he then deposited into his checking account (Tr., P.M., p. 25, ll. 12–14). This latter explanation is not supported by any independent evidence, nor were any specific deposits identified by him as having been made from funds received from her.

Regarding his explanation that some of the deposits shown on the bank statements were really loans, the trustee, at trial, invited him to examine the bank statements for the purpose of identifying the source of the deposits which represented loans or renewals. He was unable to do so (Tr., P.M., p. 23, l. 5–p. 26, l. 8). It is thus clear that perhaps at the end of each year in question he might have been able to piece together the details of his receipts and disbursements, however, by the time of this proceeding, he was no longer able to do so. Thus, if there is an explanation for the discrepancies in the records turned over by him, he is unable to provide it.

■ I am mindful of the general rule that the purpose of the Act is to permit an honest, overburdened, debtor to get a fresh start free from debt and that Section 14 must be construed strictly against the objector and liberally in favor of the bankrupt. *In re Adlman*, 541 F.2d 999, 1003 (2 Cir. 1976); *In re Kokoszka*, 479 F.2d 990, 997 (2 Cir. 1973) affd. *sub nom Kokoszka v.*

*Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374; *In re Tabibian,* 289 F.2d 793, 795 (2 Cir. 1961). However, in order to invoke the beneficent spirit of the Act, Section 14c(2) mandates that a bankrupt must make a complete disclosure of his financial condition and business transactions by producing such books and records as will permit his creditors to make such an examination.

In the case of *In re Underhill,* 82 F.2d 258 (2 Cir. 1936) *cert. den. sub nom Underhill v. Lent,* 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402, the court described the duties imposed upon a bankrupt by Section 14c(2) very clearly when it said, at pages 259, 260:

"The law is not unqualified in imposing a requirement to keep books or records, and it does not require that if they are kept they shall be kept in any special form of accounts.

*It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of the discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies.*

\*    \*    \*    \*    \*    \*

The purpose and intent of Section 14b of the Bankruptcy Act [*now section 14c*] is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs. It was never intended that a bankrupt, after failure, should be excused from his indebtedness without showing an honest effort to reflect his entire business not a part merely. To be sure, there may be records which are not books; *but it is intended that there be available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained. Records of substantial completeness and accuracy are required so that they may be checked against the mere oral statement or explanations*

*made by the bankrupt.* See *International Shoe Co. v. Lewine,* 68 F.2d 517, 518 (C.C.A.5)." (emphasis added).

In that case the court made the following comment on the bankrupt's failure to keep his checkbook stubs:

"The failure to keep his checking account stubs of canceled checks shows such neglect as to be tantamount to an attempt to conceal transactions." *Id.* p. 260.

In the case of *In re Lefkowitz,* 4 Bankr. Ct.Dec. 835, (S.D.N.Y.1978) (not officially reported) aff'd without opinion *sub nom, Lefkowitz v. Schulman,* 603 F.2d 213, (2 Cir. 1979), cert. den. *sub nom, In re Lefkowitz* 444 U.S. 835, 100 S.Ct. 69, 62 L.Ed.2d 45 (1979) which involved an attorney-bankrupt who had kept no formal records but who had turned over to the trustee his diaries, notes, deposit slips and other records, the court was faced with the same question as to their adequacy as we are in this case. In that case, Bankruptcy Judge Howard Schwartzberg had held that the books and records furnished to the trustee were insufficient to reveal the bankrupt's financial condition and business transactions and had denied his discharge. In affirming that decision, District Judge Lawrence W. Pierce said, at pages 835, 836:

"The bankruptcy judge reviewed each document produced by the bankrupt, as well as the testimony of the bankrupt himself and that of his accountant, in an effort to piece together the present financial condition of the bankrupt . . . . . This effort proved unsuccessful. With respect to the bankrupt's income, the judge found that the deposit slips could not stand as evidence of the receipt of fees by the bankrupt *since they contained no notation as to the source of the funds deposited. He made a similar finding with respect to the income tax returns since there "was no independent documentation produced which supported the information contained therein."* (emphasis added.)

In the case at bar, the bankrupt's bank statements fall into the same category as Lefkowitz's deposit slips, that is, they con-

tain "no notation as to the *source* of the funds deposited." (emphasis mine.)

The same conclusion was reached by District Judge Edward R. Neaher in the case of *In re Stein*, 416 F.Supp. 637 (E.D.N.Y. 1976) in which he affirmed the denial of the bankrupt's discharge for failing to keep and preserve books and records from which his financial condition and business transactions could be ascertained. The court stated, at page 639:

"The bankrupt contended unsuccessfully in the court below that his cancelled checks, check registers, bank statements and certain 5" × 7½" index cards with creditor accounts constituted adequate records from which his financial condition could be determined. The bankruptcy judge found as a fact that the data submitted by the bankrupt did not 'permit intelligent inquiry by the creditors'. See *Karger v. Sandler*, 62 F.2d 80, 81 (2 Cir. 1932). This finding is amply supported both by the testimony of Ira Leichter, a certified public accountant engaged by the trustee  .  .  ., and this court's independent review of the data, which reveals that at a minimum it is not possible to ascertain from those records, either the amount of money the bankrupt repaid creditors prior to bankruptcy, the amount he still owes them *or the source of the deposits totaling in excess of $363,000.*" (emphasis mine.)

Tested against these criteria, it is clear that the bankrupt, in the case at hand, who kept no record of fees paid to him by clients or any written record of the disbursements incident to his law practice; was unable to give any satisfactory explanation as to the difference between the income reported on his tax returns and the deposits made into his bank account; kept no record of the "notations" which he made for his accountant at the end of each year to enable him to prepare his tax returns and who "disposed of" his checkbook stubs, has failed to keep or preserve books or records from which his financial condition and business transactions might be ascertained as contemplated by Section 14c(2) of the Act.

The first question having been answered in the negative, we now come to the second question to be decided under this section, namely: Is the bankrupt's failure to keep or preserve books or records "justified under all of the circumstances of the case"?

It is well settled that justification for a bankrupt's failure to keep or preserve books or records will depend on the extent and nature of his transactions and whether others in like circumstances would ordinarily keep them. This rule was enunciated in *White v. Schoenfeld*, 117 F.2d 131 (2 Cir. 1941), at page 132, when the court said:

"Since *Nix v. Sternberg*, 8 Cir., 38 F.2d 611, it has been uniformly held that, after the creditor has shown the absence of any adequate records, the burden falls upon the bankrupt of satisfying the court that his failure to produce them was 'justified.' *Karger v. Sandler*, 2 Cir., 62 F.2d 80; *In re Underhill*, 2 Cir., 82 F.2d 258; *Koufman v. Sheinwald*, 1 Cir., 83 F.2d 977; *Rosenberg v. Bloom*, 9 Cir., 99 F.2d 249; *Hedges v. Bushnell*, 10 Cir., 106 F.2d 979.

"What will justify failure depends largely upon how extensive and complicated the bankrupt's business is—a cobbler will succeed with much less than a manufacturer—but the important change is that since 1926 no moral obliquity need be shown. Honesty is not enough; *the law demands as a condition of a discharge either that the bankrupt shall produce such records as are customarily kept by a person doing the same kind of business, or that he shall satisfy the bankruptcy court with adequate reasons why he was not in duty bound to keep them.*" (emphasis added.)

See also *In re Sandow*, 151 F.2d 807, 809 (2 Cir. 1945).

In the case at bar, the bankrupt testified that he never maintained any *formal* books and records in his law practice. He kept no books in which he recorded fees received from clients or the disbursements incident to the maintenance of his law office. He kept his cancelled checks, bank

statements and the tax returns, but he "disposed of" his books of check stubs. He used his bank statements and cancelled checks each year to prepare the "notations" which he sent to his accountant to be used by him in the preparation of his income tax returns and he was able to do so because he *remembered* the sources of his income and the disbursements reflected by them. Unfortunately, he kept no copies of the "notations" and, at trial, was unable to account for specific deposits recorded in the bank statements or for the disparity between the total income reflected in his tax returns and the total of the deposits recorded in the bank statements except for his contention that it was caused by "loans" and "renewals". His only justification for his failure to maintain books and records or even to retain the books of check stubs or copies of the "notations" prepared for his accountant is that he did not believe that it was necessary to keep anything but the bank statements and cancelled checks for tax purposes and that he did not contemplate going into bankruptcy.

The bankrupt's failure to keep or preserve books or records can hardly be justified on the basis of his limited education as it was in the case of *Hedges v. Bushnell*, 106 F.2d 979, 982 (10 Cir. 1939) in which that fact was taken into consideration by the court in concluding that he was justified in failing to keep or preserve books or records. On the contrary, here the bankrupt is a lawyer with over forty years experience at the bar, who had served in the New York State Assembly for over twenty years and had served as chairman of two of its most important committees, insurance and banking. As the court stated in *In re Manasse*, 125 F.2d 647, 649 (7 Cir. 1942), "Here we have the case of a lawyer who was well aware of the requirement that he keep books which would truly reflect his financial condition, and fully competent to do so." See also *In re Lefkowitz, supra.*

There are no circumstances in this case which justify the bankrupt's failure to keep or preserve books or records from which his financial condition and business transactions might be ascertained and his dis-

charge should be denied under Section 14c(2) of the Act.

There is nothing in Rule 407 of the Rules which commands a different result. That rule provides that "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the facts essential to his objection." This rule supersedes the provision in Section 14(c) *supra*, that the burden of proof shall shift from the objector to the bankrupt upon a showing by the objector "that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this subdivision c, would prevent his discharge in bankruptcy . . . ." With regard to Rule 407, it was stated in *In re Lefkowitz, supra*, at page 836, that:

"With respect to the burdens to be imposed on the various parties, Rule 407 of the Rules of the Bankruptcy Procedure provides that a plaintiff, here the trustee, has the burden of proving facts essential to his objection to the discharge. This rule does not change the initial burden which is placed upon the bankrupt of producing records from which his financial condition may be ascertained. *See* Advisory Committee's Note to Bankruptcy Rule 407; *In re Martin*, 554 F.2d 55, 58 (2d Cir. 1977)."

Here the bankrupt has failed, as did Lefkowitz, to meet his initial burden "of producing records from which his financial condition may be ascertained."

The trustee further alleges that Section 14(c)(6) provides another ground for denying the discharge. He contends that by failing to turn over checkbook stubs and other financial records, the bankrupt has refused to obey lawful orders of the court. The bankrupt insists that he does not have the checkbook stubs or any other financial records and that he has turned over to the trustee all business records which he had in his possession—a position which simultaneously defeats the Section 14(c)(6) action and supports the trustee's Section 14(c)(2) action. The bankrupt cannot be penalized under Section 14(c)(6) for "failing" to turn

over matter which he did not have. *Southern Rock Island Plow Co. v. Florence*, 29 F.2d 397, 398 (5 Cir. 1928); *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948); 1A Collier on Bankruptcy (14th Ed.) ¶ 14.57, p. 1430. Accordingly, the trustee's claim that the bankrupt's discharge be denied for failure to obey a lawful order of the court under Section 14c(6) of the Act is denied. However, the bankrupt's discharge is denied for failure to keep or preserve books of account or records from which his financial condition and business transactions might be ascertained without any justification therefor, as mandated by Section 14c(2).

The trustee is directed to submit an order providing that the bankrupt's discharge be denied.