**In the Matter of Lucio F. RUSSO, Bankrupt.**

**Avery J. GROSS, as Trustee in Bankruptcy of Lucio F. Russo, Bankrupt, Plaintiff,**

**v.**

**Lucio F. RUSSO and Tina Russo, Defendants.**

**Bankruptcy No. 78–B–22.**

United States Bankruptcy Court, E. D. New York.

March 10, 1982.

Robert W. Tauber, Brooklyn, N. Y., for Bankrupt; Cadwalader, Wickersham &

Taft, David R. Kittay, New York City, of counsel.

Guggenheimer & Untermyer, New York City, for trustee; Ephraim K. Leibowitz, New York City, of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This is a motion, brought by way of an order to show cause (Order to Show Cause signed on June 15, 1981), by Lucio F. Russo (the BANKRUPT or RUSSO) to remove Avery J. Gross, Esq. (the TRUSTEE or AVERY GROSS) as trustee of the bankrupt's estate pursuant to Section 2(a)(17) of the Bankruptcy Act of 1898, as amended, (the Act) (repealed 1978 but still applicable in these proceedings by virtue of Section 403(a) of the Bankruptcy Reform Act of 1978, Pub.L.No. 95–598, 92 Stat. 2549, 2683), 11 U.S.C. § 11(a)(17) and Rule 221(a) of the Rules of Bankruptcy Procedure (the Rules).

The attorney for the bankrupt, in the affidavit submitted in support of the order to show cause, states that the trustee should be removed for his apparent failure to avoid an alleged judgment lien against certain property of the bankrupt's estate. The motion also seeks his removal for an asserted conflict of interest arising from his dual role as a bankruptcy trustee and as executor and residuary beneficiary of the estate of his father who was a judgment creditor of the bankrupt.

The trustee denies that he has been guilty of any misfeasance or malfeasance and denies that there is any conflict of interest by reason of his being the executor and residuary beneficiary of his father's estate.

After oral argument, I set this matter for a hearing on the issues raised. It was held on August 7, 1981, at which the trustee testified, after which memoranda were submitted by counsel.

This matter is the latest chapter in what has become without a doubt a long, tortuous history of litigation. The veritable epic-like proportions of this proceeding in bankruptcy is evidenced by the near 19-page legal docket chronicling the various

actions that have occurred since the bankrupt first filed his voluntary petition in bankruptcy more than four years ago. By way of comparison, the pages of a legal docket for the average voluntary bankruptcy proceeding typically number a mere two or three pages. In an effort to set the present matter in proper perspective, the following account of the pertinent facts is provided.

Russo filed his voluntary petition in bankruptcy with this court on January 4, 1978. As provided by Section 18(f) of the Act, 11 U.S.C. § 41(f), he was accordingly adjudicated a bankrupt on that same day as a result of this filing.

Russo included among those unsecured creditors listed in his Schedule A–3 one Reuben E. Gross, Esq. (REUBEN GROSS), who, he stated, had a "disputed" claim against him of $25,762.77. Subsequently, on January 19, 1978, this creditor submitted a proof of claim to this court for this amount, which consequently made him the largest general creditor of Russo's estate. In his proof of claim, Gross characterized the debt as a "general unsecured claim." (Proof of Claim filed by Reuben Gross, January 19, 1978).

Under my supervision, and as mandated by Section 55(a) of the Act, 11 U.S.C. § 91(a) and Rule 204(a) of the Bankruptcy Rules, a first meeting of creditors was held on January 19, 1978, at which time a trustee for the bankrupt's estate was elected. The sole creditor in attendance at this meeting was Reuben Gross. Mr. Gross, by voting his claim as unsecured, as provided in Section 44(a) of the Act, 11 U.S.C. § 72(a), elected his son, Avery, as trustee of Russo's estate in bankruptcy. During the course of the election, the following colloquy took place:

"THE COURT: There's a proof of claim. Whom do you nominate, Mr. Gross?

MR. GROSS: I nominate Avery J. Gross.

THE COURT: Are there any other nominations? (no response)

THE COURT: The nominations will be closed. The claim of Reuben E. Gross in the sum of $25,762.77; I assume will be voted for Mr. Avery Gross, is that correct?

MR. GROSS: Yes.

THE COURT: All right. I'll approve the election of Mr. Gross and fix the bond at $1,000."

(Tr. January 19, 1978, p. 10)

It should be noted, that if Reuben Gross had filed his proof of claim as a judgment lienor, he would have been precluded from participating in the election of the trustee, as specified by Section 56(b) of the Act, 11 U.S.C. § 92(b). Section 56(b) states:

"Except as otherwise provided in this Act, creditors holding claims which are secured or have priority shall not in respect to such claims be entitled to vote at creditors' meetings, nor shall such claims be counted in computing either the number of creditors or the amount of their claims, unless the amounts of such claims exceed the values of such securities or priorities, and then only for such excess."

Later in 1978, Reuben E. Gross died. His will provided that his son, Avery, serve as the primary executor of his testamentary estate, and also named him as a direct and residuary legatee. (Bankrupt's Exhibit Four). Implicit as one of the assets of the elder Gross's estate was his judgment of $25,762.77 against the bankrupt. Since much of my decision in the instant matter rests on the legal significance of this judgment, I will discuss in detail its derivation and subsequent evolution into the crux of this present controversy.

Reuben Gross attained his status as a creditor of Russo based on the judgment obtained by him against Russo on October 24, 1977 in the amount of $25,762.77. (Bankrupt's Exhibit Three). This judgment represented the successful culmination of a suit brought in 1972 by Reuben Gross for the recovery of attorney's fees arising from services rendered by him to Russo in a defamation action. It is, perhaps, not without significance that Avery Gross participated in the preparation of the attorney's fees action against the bankrupt. (Tr. August 7, 1981, p. 9).

On the same day that judgment was rendered in the attorney's fees action, it was docketed with the clerk of Richmond County in an apparent effort to create a lien against property located at 82 Romer Road, Staten Island, New York. It appeared that Russo had owned this property with his wife, Tina, as tenants by the entirety. Thus, Avery Gross, on behalf of his father, caused an execution to be issued with respect to this judgment. (Bankrupt's Exhibit Two). The execution, however, was returned unsatisfied. (Tr. August 7, 1981, pp. 12–13).

Prior to the time of the docketing of the judgment, Russo, together with his wife, conveyed all of their interest in 82 Romer Road to Tina Russo alone. Upon learning of the disposition of the property, Avery Gross, acting as the attorney of record for his father, prepared papers during December of 1977 in preparation for a state court action to set aside the conveyance as fraudulent. (Bankrupt's Exhibit One).

The action was not commenced, however. (Tr. August 7, 1981, pp. 6–8). Approximately one month after these initial steps to avoid the conveyance of the Romer Road property were undertaken, Russo filed his voluntary petition in bankruptcy. Once the petition was filed, it operated as an automatic stay of all actions founded on any dischargeable debt pending against the bankrupt under the provisions of Bankruptcy Rule 401(a). Rule 401(a) provides:

"The filing of a petition shall operate as a stay of the commencement or continuation of any action against the bankrupt, or the enforcement of any judgment against him, if the action or judgment is founded on an unsecured provable debt other than one not dischargeable under clause (1), (5), (6), or (7) of § 17a of the Act."

Because of the effect of this Rule, the Grosses did not follow up their initial steps to set aside the conveyance in a state forum.

Reuben Gross consequently sought to rely on what remedies the Bankruptcy Act would afford him in having his judgment against Mr. Russo satisfied. Following his election as trustee, Avery Gross brought an adversary proceeding in a renewed attempt to set aside the conveyance as fraudulent. As a result of this action, I found that the conveyance of the Romer Road property was fraudulent as to Reuben Gross due to the lack of fair consideration supporting it under Section 70(e)(1) of the Act, 11 U.S.C. § 110(e)(1) and, by incorporation, pertinent provisions of the New York State Debtor and Creditor Law. *In re Russo*, 1 B.R. 369 (Bkrtcy.E.D.N.Y.1979), *aff'd*, Bkrtcy. No. 78–B–22, slip. op. (E.D.N.Y. September 11, 1980).

Upon my finding that the conveyance was fraudulent, I next considered the proper remedy to be applied. I held that the conveyance was "null and void as against the trustee" and that the property therefore passed to the bankrupt's estate, pursuant to Section 70(e), subdivisions (1) and (2) of the Act, 11 U.S.C. §§ 110(e)(1) and (2). *In re Russo*, 1 B.R. at 383.

Avery Gross, as trustee, argued that he had the option under Section 70(e)(2) of the Act, 11 U.S.C. § 110(e)(2) to preserve the transfer in Tina Russo's possession and thereby to enforce the creditor's claim against the bankrupt's original share of that property free of the restrictions of a tenancy by the entirety. *In re Russo*, 1 B.R. at 384–85. Specifically, he requested that the court either order Mrs. Russo to convey a one-half interest directly to the trustee or direct that a money judgment to the extent of the claims against the bankrupt be docketed as a lien against the property. *Id.* at 384.

I rejected his argument and held that his remedy, as trustee, would be limited to the recovery of what the bankrupt actually conveyed to his wife, namely, his own contingent right of survivorship. *Id.* at 385. Since Russo was never seised of his wife's interest in the tenancy by the entirety, I concluded that her interest could not become a part of the bankrupt's estate regardless of whether or not the trustee elected to avoid or preserve the fraudulent conveyance, as provided in Section 70(e)(2) of

the Act, 11 U.S.C. § 110(e)(2). Consequently, I ordered that the tenancy by the entirety should be restored and that Mrs. Russo reconvey the Romer Road property to Lucio Russo and herself. *Id.* at 386. Parenthetically, this restoration of the conveyance by Tina Russo to herself and Lucio Russo, pursuant to my order, finally occurred on August 5, 1981 when the new deed was recorded.

District Judge Eugene H. Nickerson, in his affirmance of my holding denying the trustee's request to preserve the conveyance, observed perceptively, "It is not apparent why the fact that a bankrupt [who] attempted a voidable transfer of his property should put the bankrupt's creditors in a more favorable position than they would have occupied if no transfer had ever occurred." *In re Russo*, Bkrtcy. No. 78–B–22, slip op. at page 8 (E.D.N.Y. September 11, 1980).

Thus the effect of my decision regarding the trustee's rights in the Romer Road property was that upon the reconveyance of Tina Russo's interest to herself and the bankrupt, the trustee succeeded to his interest in the subject property, that is, Russo's right of survivorship in the tenancy by the entirety. *See* 2 Collier on Bankruptcy ¶ 18.43, p. 172 (14th ed. 1976) ("The trustee, appointed subsequent to the adjudication, becomes the successor in title to the bankrupt's property as of the date of the filing of the petition.").

Following this decision, Avery Gross made application on January 15, 1980 to be appointed attorney for himself as trustee, *pro se, nunc pro tunc,* and to be awarded attorney's fees earned for services he allegedly rendered in that capacity in connection with the fraudulent conveyance action. As part of this application, he filed with this court an affidavit of services, replete with a detailed résumé of the work he had performed. He claimed that the value of these services totaled $17,250.00. In support of this application, he stated, in his affidavit: "As such attorney I have not had, and do not have, any interest that might be adverse to my interest in this matter as trustee." (Affidavit of Attorney's Services for Avery Gross filed on January 15, 1980, p. 16).

I denied his application to be appointed attorney *pro se, nunc pro tunc* and his request for legal fees in a supplemental opinion issued on April 15, 1980. Among the reasons I cited in support of this decision were the following. First, Avery Gross, in his capacity as trustee, had previously submitted an application for the retention of Leon Brickman, Esq., to serve as trial counsel and, on November 1, 1979, I signed an order authorizing it. However, in the application for Mr. Brickman's retention, Gross failed to mention that there would be any need for *him* to perform any services as his own attorney or that he would later seek to be retained as attorney *pro se.* Second, there appeared to be no excuse justifying the inordinate delay of two years between the time he was elected trustee and when he sought to be retained as attorney *pro se, nunc pro tunc.* Lastly, I was dissuaded by the amount of compensation sought by him. He requested $17,250 which was almost twice the amount requested by Mr. Brickman for the services rendered by him as trial counsel. Parenthetically, Brickman requested $8,850 and I allowed $5,800 (Supplemental Decision dated April 15, 1980, p. 10) for which the trustee entered judgment on May 1, 1980.

Particularly regarding the first consideration, I commented, at pages 6 and 7:

"It must be remembered that in addition to being trustee, he [Avery Gross] is the attorney for the bankrupt's largest creditor, his deceased father, whose estate would benefit most from any recovery. As a matter of fact, the trustee, subsequent to the commencement of this action, commenced an adversary proceeding to deny the bankrupt's discharge.... Had the trustee submitted an order for his retention, *pro se*, in addition to that submitted by him for Mr. Brickman's retention, I have serious doubt that I would have signed both of them; I would have signed one or the other."

I also observed in this decision an apparent oversight committed by Mr. Gross in his application to retain Mr. Brickman and in Brickman's supporting affidavit. Neither of these two documents mentioned that Mr. Brickman had represented Mr. Gross's late father in the trial of the action brought by the elder Gross against the bankrupt which resulted in the judgment which then, in turn, became the basis for his claim in the bankruptcy proceeding. "It seems to me," I noted, "that Rule 215(a) of the Rules of Bankruptcy Procedure is clear that the application should have stated 'all of [Mr. Brickman's] connections with . . . the creditors or any other party in interest and their respective attorneys and accountants.'" *In re Russo*, Bkrtcy. No. 78–B–22, slip op. at page 9 (B.C.E.D.N.Y. April 15, 1980).

As the result of the action brought by the trustee, I denied the bankrupt's discharge for his failure to keep adequate books and records (3 B.R. 28, 22 C.B.C. 703) and I signed an order to that effect on March 4, 1980. The bankrupt appealed and the order was affirmed. *In re Russo*, Bkrtcy. No. 78–B–22, slip op. (B.C.E.D.N.Y. September 3, 1980).

On August 4, 1981, shortly after Russo brought the present application, Avery Gross applied to this court to be permitted, as the trustee, "to abandon the survivorship interest of the bankrupt" in the Romer Road property. (Bankrupt's Exhibit Five). To substantiate his application, he stated that the interest of the bankrupt in the Romer Road premises was "subject" to certain "liens," specifically Reuben Gross's judgment and his own judgment, as trustee for Brickman's legal services rendered in connection with the fraudulent conveyance action.

In addition to these encumbrances, he noted that the value of the bankrupt's interest was "solely" that of a survivorship interest. Based on this consideration, the trustee alternately declared that this interest was of "minimal" and "limited" value because of the asserted unlikelihood that Russo would survive his wife based on the two year difference in ages between them.

In an order annexed to his application submitted for my signature, he elaborated further that "the property . . . has no realizable value." *Id.*

Upon retention of counsel for the purpose of defending himself in the present motion, the trustee withdrew this application without explanation. (*See* Tr. August 7, 1981, pp. 2–4).

The bankrupt, as stated above, initiated the instant motion by an order to show cause signed on June 15, 1981. In his application, he demands that Avery Gross be removed as trustee for his alleged failure to remove his father's alleged judgment lien against the bankrupt's estate pursuant to Section 67(a)(1) of the Act, 11 U.S.C. § 107(a)(1) and because he has a conflict of interest adverse to his duties and responsibilities as trustee of the bankrupt's estate. Section 67(a)(1) provides:

"Every lien against the property of a person obtained by attachment, judgment, levy, or other legal or equitable process or proceedings within four months before the filing of a petition initiating a proceeding under this Act by or against such person shall be deemed null and void (a) if at the time when such lien was obtained such person was insolvent or (b) if such lien was sought and permitted in fraud of the provisions of this Act: *Provided, however*, That if such person is not finally adjudged a bankrupt in any proceeding under this Act and if no arrangement or plan is proposed and confirmed, such lien shall be deemed reinstated with the same effect as if it had not been nullified and voided." (original emphasis).

The sole issue presented in this matter is whether Avery Gross should continue to be the trustee of the bankrupt's estate. In order to make this determination, I have focused with some particularity on his actions as trustee with respect to the judgment which his father had obtained against the bankrupt. Thus, this decision first addresses the legal effect of Reuben Gross's judgment and then examines the measures undertaken by the trustee regarding it and its effect, if any, on the bankrupt's estate.

During testimony taken at the hearing held herein, Avery Gross was most equivocal concerning the legal significance of his father's judgment against Russo. The following is a typical exchange:

"Q  Mr. Gross, does the estate of Reuben Gross presently have a judgment lien against Mr. Russo, the debtor?

"A  Really that's a legal conclusion."

(Tr. August 7, 1981, p. 18).

Later in the hearing, reference was made to the application to abandon the trustee's interest in the Romer Road property which had been prepared by him. In this document, he stated that the "judgment liens" of his father and one which he had acquired as trustee were encumbering this property to the extent that there was little value in the trustee retaining his interest therein. (Bankrupt's Exhibit Five). Upon being questioned by opposing counsel about this application and the statements made therein, he was somewhat more certain of the legal effect of his father's judgment:

"Q  So it is your opinion that the matters in the application, which are referred to, would effect [sic] the value of the premises as being liens?

"A  Yes, they may."

(Tr. August 7, 1981, p. 23).

Despite his apparent uncertainty, it is the conclusion of this court that Reuben Gross's judgment did in fact legally constitute a valid, enforceable lien against the Romer Road property under the applicable laws of New York. The lien, however, would be rendered voidable by operation of certain provisions of the Bankruptcy Act.

Reuben Gross obtained his judgment against Russo on October 24, 1977. (Bankrupt's Exhibit Three). It was duly docketed with the clerk of Richmond County on the same day that the judgment was rendered. An execution in enforcement of the judgment was caused to be issued to the Sheriff of Richmond County on December 8, 1977 by Avery Gross, as attorney for his father (Bankrupt's Exhibit Two), but it was returned unsatisfied, due to Russo's previous conveyance of the Romer Road property to his wife.

At this point, Reuben Gross was not left without any remedial recourse under New York's debtor and creditor laws. First, as provided in Section 278(1) of the state debtor and creditor law, N.Y.Debt. & Cred.Law § 278(1) (McKinney 1945), the elder Gross could have moved to have his judgment attach to the Romer Road property irrespective of Russo's conveyance of his interest in it to his wife. Second, he could have had the conveyance set aside to the extent necessary to satisfy his claim. Section 278(1) provides:

"Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser.

a.  Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

b.  Disregard the conveyance and attach or levy execution upon the property conveyed."

At least in regard to the former alternative, he did undertake some preliminary preparations to commence a state court action to set aside the conveyance as fraudulent. (Bankrupt's Exhibit One). These initial steps were not followed up (Tr. August 7, 1981, pp. 6–8), because he and his son were prevented from pursuing their state remedies by Russo's filing his bankruptcy petition on January 4, 1978. Under the provisions of Bankruptcy Rule 401(a), this filing automatically acted to stay the commencement or continuation of any action on a dischargeable debt against him.

Instead, the Grosses sought to rely on what remedies the Bankruptcy Act would afford them. Reuben Gross thus filed his claim, based on the judgment, as an unsecured debt which consequently, under Section 56(b) of the Act, 11 U.S.C. § 92(b), enabled him, as the estate's largest creditor, to dominate the election of the trustee and thereby ensure control over the disposition of the bankrupt's assets.

Utilizing his power as an unsecured creditor in this regard, he elected his son and law partner, Avery, as trustee. Once elected, Avery Gross was a most diligent trustee who pursued with the utmost care and perseverance all avenues contributing to augmenting the size of the bankrupt's estate. One of his principal achievements was the setting aside of Russo's conveyance of the Romer Road property as fraudulent.

It would appear that his purpose in setting aside the conveyance was to add this property to the bankrupt's estate. The problem presented, however, is what effect this reconveyance had on the Gross judgment and, most importantly, whether this judgment, at any time, became a lien against the newly regained interest of the bankrupt in the property which attached thereto within the prohibited four month period preceding the bankrupt's filing in bankruptcy.

To begin with, the Bankruptcy Act equips the bankruptcy trustee with "special" powers enabling him or her to avoid certain liens acquired against the bankrupt's estate within a specified time period. A. Paskay, "Trustees' and Receivers' Handbook," 11A Collier on Bankruptcy ¶ 12.002, p. P–379 (14th ed. 1978). The principal provisions of the Act relating to an aspect of these special powers which are involved here are codified in Section 67(a)(1), 11 U.S.C. § 107(a)(1).

Section 67 of the original Bankruptcy Act of 1898 had two subdivisions which operated to invalidate various liens obtained within four months of bankruptcy. The first subdivision, then designated as 67(c), applied to liens acquired through legal and equitable proceedings. The second subdivision, 67(f), applied specifically to levies, judgments and attachments.

In 1938, both subdivisions were consolidated into one, 67(a), by the Chandler Act, 52 Stat. 840 (1938). It also added a provision requiring the reinstatement of liens if the debtor was not ultimately adjudicated a bankrupt. 4 Remington on Bankruptcy § 1606, pp. 5–6, 10 (1957).

One of the basic purposes of the Bankruptcy Act is to "assure that all creditors are treated equally," A. Paskay, "Trustees' and Receivers' Handbook," 11A Collier on Bankruptcy ¶ 13.004, p. P–408 (14th ed. 1978). Section 67(a) achieves this end by operating to prevent any creditor from obtaining an undue advantage over others who are not so diligent, so that it addresses the problem of the proverbial "race to the courthouse." *Id.; see also* 4 Remington on Bankruptcy § 1606, p. 5 n.10 (Supp.1978) ("Purpose of § 67(a) is to prevent one creditor being preferred over the others . . . .").

■ Under Section 67(a), the bankruptcy trustee is empowered to void all liens arising from judicial proceedings within the four month period preceding the filing of a bankruptcy petition. Specifically, the trustee may avoid attachment liens, judgment liens, or liens arising as the result of a levy, execution or garnishment. *See* A. Paskay, "Trustees' and Receivers' Handbook," 11A Collier on Bankruptcy ¶ 13.004, pp. P–408–09 (14th ed. 1978). As Collier notes, "There is seldom a case in which creditors did not obtain a judgment against the bankrupt immediately before bankruptcy." *Id.* at P–409. This power, however, does not extend to the avoiding of judgments or decrees in enforcement of an otherwise valid preexisting lien, even if such enforcement proceeding is brought within the four month period. *See Metcalf v. Barker*, 187 U.S. 165, 174, 23 S.Ct. 67, 71, 47 L.Ed. 122, 126–27 (1902).

■ Concerning the mechanics of interpreting Section 67(a), there are several important prefatory points of which to be aware. First, the provision does not automatically operate to avoid such liens; rather, the trustee must take affirmative action to attack them. Therefore, it is "absolutely imperative" that the trustee make a speedy determination of the validity of any lien or encumbrance on the bankrupt's estate. A. Paskay, "Trustees' and Receivers' Handbook" 11A Collier on Bankruptcy ¶ 13.004 p. P–409 (14th ed. 1978).

■ Second, the trustee's power to avoid liens against the bankrupt's estate only extends to those instances where the debtor is duly adjudicated a bankrupt. A major exception to this power is recognized in the proviso added in 1938 to Section 67(a) by the Chandler Act. The proviso reinstates a lien against the property of a *non-adjudicated* bankrupt irrespective of the fact that the lien may have been obtained within the suspect four month period. It was appended to Section 67 to eliminate any possible controversy that may have developed without such an explicit exception. 4 Remington on Bankruptcy § 1616.2 p. 52 (1956). Consequently, the determination of whether there has been an adjudication is crucial to the question of whether a trustee may, in fact, avoid any lien encumbering the debtor's property.

■ Under Section 18(f) of the Act, 11 U.S.C. § 41(f), the filing of a voluntary petition in bankruptcy by a person automatically operates to adjudicate that person a bankrupt in "all" cases. 2A Collier on Bankruptcy ¶ 38.03, p. 1405 (14th ed. 1978); *see also Bank of Marin v. England*, 385 U.S. 99, 102, 87 S.Ct. 274, 277, 17 L.Ed.2d 197, 201 (1966) ("And in case of a voluntary petition . . . the filing operates as an adjudication."). Section 18(f) provides:

> "The filing of a voluntary petition under Chapters I to VIII of this Act, other than a petition filed in behalf of a partnership by less than all of the partners, shall operate as an adjudication with the same force and effect as a decree of adjudication."

In the instant case, it is clearly a matter of record that Russo filed his voluntary petition in bankruptcy on January 4, 1978. Thus as specified by Section 18(f) of the Act, he was thereby automatically adjudicated a bankrupt on that very same day. In contrast, before the 1959 amendments to this provision, former Section 18(g) required the bankruptcy judge to make a separate order of adjudication in voluntary bankruptcy cases. 2A Collier on Bankruptcy ¶ 38.03, p. 1405 (14th ed. 1978).

■ It should also be noted that my subsequent denial of Russo's discharge on February 12, 1980 had no effect on his standing as an adjudicated bankrupt. Although at first blush it appeared to me that the denial of his discharge would have some bearing on his status as an adjudicated bankrupt, (*see* Tr. June 3, 1981, p. 31), upon research and reflection I have concluded otherwise. As Remington notes, "No one is a 'bankrupt' until adjudicated such. Once an adjudication is entered, it is a determination of status." 2 Remington on Bankruptcy § 538, pp. 3–4 (1956); 2 Collier on Bankruptcy ¶ 18.43, p. 172 (14th ed. 1976). Furthermore, this status continues throughout the term of bankruptcy. The failure to obtain a discharge does not affect the right of all of the bankrupt's creditors to share equally in his or her assets, *H. D. Lee Co., Inc. v. Bostian*, 187 F.2d 942, 947 (8th Cir. 1951), and the courts do recognize that the denial of a discharge is a concept readily distinguishable from the fact of adjudication. *See, e.g., id.; Chichester v. Golden*, 204 F.Supp. 634 (S.D.Cal.1962), *aff'd in part, mod'd and rev'd in part on other grounds*, 321 F.2d 250 (9th Cir. 1963). Therefore, despite the denial of the bankrupt's discharge, his status as an adjudicated bankrupt continues.

■ The final and perhaps most important consideration for our purposes concerning the operation of Section 67(a) relates to defining the point at which a judgment becomes a lien. To invalidate a lien under this section, the trustee must first establish that the lien was 1) acquired through legal or equitable means; 2) attached during the insolvency of the bankrupt or was obtained in fraud of the Bankruptcy Act; and 3) was procured within the four months preceding the initiation of the bankruptcy proceeding.

To carry out the obligation imposed by Section 67(a), the trustee must ultimately look to state law to determine "when, how, and on what a judgment becomes a lien." *In re Otto Huber & Sons, Inc.*, 3 B.R. 363, 364 (Bkrtcy.S.D.1980); *see also* 4 Collier on Bankruptcy ¶ 67.08, p. 119 (14th ed. 1978).

A summary of the events and dates surrounding the acquisition of Reuben Gross's judgment against the bankrupt's property is as follows:

October 5, 1956  Lucio Russo and his wife, Tina Russo, take title to the property located at 82 Romer Road in Staten Island, New York.

July 28, 1972  Reuben Gross sues Lucio Russo for attorney's fees due him.

September 6, 1973  Reuben Gross serves a note of issue upon Russo, which is filed the next day.

October 19, 1973  Lucio Russo conveys his interest in the Romer Road property to his wife.

October 24, 1977  Reuben Gross obtains a judgment for $25,762.77 against Lucio Russo.

This judgment is docketed in Richmond County, the situs of the Romer Road property.

January 4, 1978  Lucio Russo files a voluntary petition in bankruptcy and is adjudicated a bankrupt on that day.

November 30, 1979  Russo's conveyance of his interest in the Romer Road property to his wife is found to be fraudulent and is avoided *ab initio*.

March 4, 1980  An order is issued denying Lucio Russo's discharge.

Regarding the first criterion required to establish the status of a lien under Section 67(a) and thereby render it voidable under this section, it is without doubt that the $25,762.77 judgment Reuben Gross obtained on October 24, 1977 was a "legal proceeding" clearly contemplated by Section 67(a)(1). *See, e.g., In re Brisbane*, 2 B.R. 636, 638 (Bkrtcy.E.D.Va.1980) ("It is clear that the rendition of a judgment is a 'legal proceeding' within the meaning of Section 67(a)(1).").

The next criterion necessitates establishing that the lien attached during the insolvency of the bankrupt or that it was obtained in fraud of the Bankruptcy Act. The latter alternative is not applicable to the instant matter, for no fraud has been asserted in any respect concerning the acquisition of Reuben Gross's judgment. In ad-

dition, the insolvency of Russo as of October 24, 1977 is not controverted. As part of my decision holding that he fraudulently conveyed his interest in the Romer Road property with the intent to hinder, delay or defraud his creditors, I necessarily found that as a result of this conveyance, it was "manifest" that he consequently rendered himself insolvent. *In re Russo*, 1 B.R. at 381 (Bkrtcy.E.D.N.Y.1979).

A critical element of both the second and third criteria is the time of attachment of the judgment. If the judgment is found to have attached and thereby become a lien within the prohibited four month period, the lien would be voidable under Section 67(a)(1).

To answer this determinative question, we must look to the law of New York State to discover when, if ever, the judgment became a lien against the Romer Road property. As Collier explains, "A judgment, however, is often not a lien *ex proprio vigore*. Until it becomes such, as by docketing in a register's office, it is not affected by this subsection [Section 67a], notwithstanding the use of the word 'judgment' in the first clause [of Section 67a].' 4 Collier on Bankruptcy ¶ 67.08, p. 119 (14th ed. 1978).

The existence of a lien for purposes of Section 67(a) is therefore derivatively determined by reference to the appropriate state law. Under New York law, a judgment, to constitute a lien against property of the judgment debtor, must be properly docketed in the office of the clerk of the county in which the debtor's real property lies. N.Y.Civ.Prac.Law & Rules § 5203(a) (McKinney 1978). Section 5203(a) provides:

"*Priority and lien on docketing judgment.* No transfer of an interest of the judgment debtor in real property, against which property a money judgment may be enforced, is effective against the judgment creditor either from the time of the docketing of the judgment with the clerk of the county in which the property is located until ten years after filing of the judgment-roll, or from the time of the

filing with such clerk of a notice of levy pursuant to an execution until the execution is returned...."

The effect of the procedure for creating a lien under this section is summarized in the following: " 'Docketing' occurs when the basic facts of the judgment are recorded ... and the judgment becomes a lien on the real property of the judgment debtor in the county as of that moment.... Only a docketing of the judgment in the office of the county clerk will bring about the lien." Practice Commentaries, N.Y.Civ.Prac.Law & Rules § 5203(a), p. 102 (McKinney 1978); see also 35 N.Y.Jur. "Liens" § 23, p. 215 (1964).

In our case, Russo had no property on October 24, 1977 when Reuben Gross's judgment was docketed as the result of his fraudulent conveyance of the Romer Road property more than four years prior thereto. This prior conveyance, counsel for the trustee argues, thereby prevented the judgment from attaching and thus precluded the judgment from becoming an enforceable lien. He further claims that where a judgment debtor has no property and then subsequently acquires property, the lien will attach automatically at the time when the judgment debtor acquires it.

In support of this latter premise, trustee's counsel cites the venerable case of *Hulbert v. Hulbert*, 216 N.Y. 430, 111 N.E. 70 (1916). In *Hulbert*, three successive judgments were filed against the judgment debtor. Upon the death of his father, the debtor inherited real property in the same county in which the judgments were recorded. The New York Court of Appeals held that these judgments attached simultaneously to the debtor's interest in the newly acquired property. Once he gained this interest, the court reasoned:

"Pursuant to the settled rule, which is not questioned by either party upon this appeal, the three judgments referred to became liens on the after-acquired property of the judgment debtor at the time of its acquisition by the debtor. (citation omitted) The liens of these three judgments, therefore, attached simultaneously to the

interest of Hulbert upon his acquiring title to that interest on the death of his father." 216 N.Y. at 433, 111 N.E. at 71.

I find, however, that counsel's reliance on this case is clearly misplaced. New York law explicitly distinguishes between the *Hulbert* situation and one in which the debtor is propertyless as the result of a fraudulent conveyance of his interest in real property made prior to the docketing of a creditor's judgment against such property. This distinction is made clear in the following:

"Since a judgment creditor is not a purchaser for value, the judgment attaches only to such rights as the judgment debtor owned at the time of the entry of the judgment, or which he thereafter acquired. And the lien does not attach to property which the judgment debtor parted with prior to the time when the judgment was docketed *unless such property was fraudulently conveyed*." (emphasis added) 35 N.Y.Jur. "Liens" § 31, p. 223 (1964).

The facts of the present matter are also to be distinguished from the situation in which the judgment debtor *subsequent* to the docketing of the judgment transfers his interest in the property to another to defeat the effect of the judgment. *See, e.g., Hohenrath v. Wallach*, 37 A.D.2d 248, 323 N.Y. S.2d 560 (2d Dep't 1971), *appeal denied*, 30 N.Y.2d 674, 332 N.Y.S.2d 106, 282 N.E.2d 891 (1972).

More closely aligned to the particular factual circumstances of the instant matter is a more venerable case, *Hillyer v. LeRoy*, 179 N.Y. 369, 72 N.E. 237 (1904). In *Hillyer*, the plaintiff-creditors obtained a judgment against the defendant-debtors in 1897. The following year, the plaintiffs sued the defendants regarding, in part, certain real estate transfers made by the defendants shortly prior to the judgment that the plaintiffs acquired in 1897. In essence, the plaintiffs alleged that the transfers had been made while the defendants were insolvent and that they had been undertaken with the intent to defraud and hinder the defendants' creditors. In May of 1899, the

defendants filed voluntary petitions in bankruptcy and, one month later, they were discharged. Parenthetically, the plaintiffs' lien in this case was obtained more than four months before the defendants filed their bankruptcy petitions, so no issue of voidability of the lien was raised under Section 67 of the Bankruptcy Act.

Concerning when the plaintiffs' lien came into existence, the court held:

"The effect was to impress upon the real estate of the judgment debtors a lien; *not only as to such which was then actually held by them, but as to any that had been transferred by them in fraud of their creditors. That is a proposition, which is too firmly settled by the decisions of the courts of this state to be now questioned. The property of a debtor, which has been transferred by him in fraud of creditors, still remains, as to them, the debtor's property and the lien of the creditor's judgment attaches to the real estate.* The judgment creditor may enforce his judgment by a sale of the land under execution; or he may bring an action to remove the obstruction caused by the debtor's fraudulent act and proceed to enforce his judgment by a sale of the land, unembarrassed by the cloud of the transfer." 179 N.Y. at 375–76, 72 N.E. at 238. (emphasis mine)

The holding of *Hillyer* remains good law. As New York Jurisprudence observes:

"Since the lien of a judgment creditor attaches to the real estate of the judgment debtor by the docketing of the judgment, he then has priority over other creditors who have not yet obtained a lien upon that property which entitles him to be first paid out of such property. The lien attaches not only to real estate held by the judgment debtor but also to any that has been transferred by him in fraud of creditors, and by bringing an action to set aside the transfer as an obstruction so that he may proceed to enforce his judgment by a sale of the land the judgment creditor does not abandon his lien and his right to priority. *The priority of judgment liens on real property fraudulently conveyed by the judgment debtor is determined according to the date of docketing of the judgments rather than according to the order in which creditors' suits are instituted.* Where a judgment creditor brought an action in the nature of a creditor's bill to set aside a fraudulent transfer, the creditor's diligence and efforts in uncovering the fraud and in bringing and trying the action gives him a lien entitling him to have his claim first satisfied out of the assets fraudulently transferred." 24 *N.Y.Jur.* "Fraudulent Conveyances" § 139, p. 566 (1962) (emphasis added).

▪ Based on this interpretation of Section 278(1) of the New York Debtor and Creditor Law, the time of attachment of the Gross judgment against the Romer Road property would be October 24, 1977, the day on which the judgment was docketed. As of this date, Russo still had not filed his petition in bankruptcy, so the attachment was not thwarted by any bankruptcy trustee's statutorily pre-eminent interest in the bankrupt's property. Nevertheless, by virtue of the operation of Section 67(a) of the Bankruptcy Act, this lien was rendered voidable for it was obtained within four months of the bankrupt's filing in bankruptcy, that is, four months of January 4, 1978.

As observed above, Section 67(a) is not a self-actuating provision, for it only renders affected liens *voidable* not void. The section, therefore, imposes on the trustee an affirmative obligation to avoid any lien covered by Section 67(a). This Avery Gross failed to do.

Section 70(a) of the Act, 11 U.S.C. § 110(a), "expressly vests" a bankruptcy trustee with all property transferred by the bankrupt in fraud of creditors. *See In re Conforti*, 43 F.2d 340, 342 (3rd Cir. 1930). Presently, title to the bankrupt's interest in the Romer Road property still remains in the trustee. In August of last year, Avery Gross made application to abandon the trustee's interest in the property. The inevitable result of this abandonment would have been that the lien of Avery Gross, as execu-

tor of his father's will, would have become an enforceable lien against the property on its reversion to Russo's ownership. *Cf. Chichester v. Goldin, supra,* at 637 ("There is no law which prevents a person who has been adjudicated a bankrupt, but has been denied a discharge, from later engaging in business.... The only effect of failure to receive a discharge is to subject his after-acquired property and future earnings to levy under attachment or execution in a proper proceeding.").

■ The self-serving potential of Avery Gross's attempted abandonment is discussed later. It suffices to say here that even upon the reversion of the Romer Road property to Russo, the lien would still be voidable, for the protections afforded by Section 67(a) to a bankruptcy trustee are also available to the bankrupt when the trustee abandons property. Remington explains:

"A bankruptcy trustee can abandon property, rights of action, etc., which he considers worthless to the estate, in which case the property or right usually reverts to the bankrupt. Since the statute [Section 67a] makes liens within its terms null and void without limiting nullity to the trustee, the bankrupt can assert § 67(a) as against a lien on property reverting to him by abandonment, by analogy to his right to resort to it for the protection of his exemptions." 4 Remington on Bankruptcy § 1612.4, pp. 22–23 (1957).

■ Finally, in voting as an unsecured creditor in the election of the trustee of the Russo estate, Reuben Gross waived whatever secured creditor status he may have had, as provided in Section 56(b) of the Act, 11 U.S. § 92(b). Although the mere filing of a secured debt as unsecured does not conclusively amount to a waiver of security against a bankrupt's property, *see* 2 Remington on Bankruptcy § 930, p. 407 (1956), a valid waiver will be found to have been made if, in addition for example, the secured claimant votes the claim for the full amount in the trustee election. *Id.* at 108–09. In our case, not only did Reuben Gross file his claim as unsecured (Proof of Claim filed by Reuben Gross, January 19, 1978), but he voted the full value of his claim to elect his son trustee of the bankrupt's estate. (Tr. January 19, 1978, p. 10).

■ Hypothetically, if Avery Gross had successfully managed to abandon the interest of the trustee in the Romer Road property, Reuben Gross's estate should be held to the elder Gross's waiver of his secured status, notwithstanding the law of New York permitting the enforcement of a judgment as a lien against property later acquired by the judgment debtor. It is a long recognized precept of the bankruptcy laws that although the existence and effect of liens are to be determined by state law, state law "cannot be applied where to do so would frustrate or debilitate federally enacted policy." *In re Taddeo,* 15 B.R. 273, 275 (D.C.E.D.N.Y.1981). As applied here, it would surely defeat the entire rationale of Section 56(b) of the Act, 11 U.S.C. § 92(b) to permit a secured creditor to waive his secured status in order to control the trustee's election and then to reassert that status subsequently by relying on state law.

I now turn to my discussion of the asserted conflict of interest of Avery Gross in his performance as trustee of the Russo estate. My purpose in examining, in such depth, the facts concerning Reuben Gross's judgment in the opening portion of this decision was, in part, to present a close analysis of the trustee's actions in light of this aspect of the estate. Unfortunately, I find that an overriding portion of these actions reflect a pattern of behavior showing his increasing difficulty to perform properly as a bankruptcy trustee while also maintaining his responsibilities as a testamentary representative of his father's estate.

■ The Act clearly recognizes that a trustee is an "officer" of the court. Sections 1(22) and 33 of the Act, 11 U.S.C. § 1(22) and § 61. As Remington notes, the title of "trustee" has "fiduciary significance in the equity sense." 2 Remington on Bankruptcy § 1117, p. 580 (1956). In such a capacity, it necessarily follows that the trustee may not be the representative of

any particular creditor, but must represent all creditors without partiality. *See In re Lewensohn*, 121 F. 538, 539 (2d Cir. 1903) ("The trustee represents every creditor."). The trustee's role thus effectuates the "general philosophy" of the Bankruptcy Act which is to "assure that all creditors are treated equally." A. Paskay, "Trustees' and Receivers' Handbook," 11A Collier on Bankruptcy ¶ 13.004, p. P–408 (14th ed. 1978). Just as "[e]quity tolerates in bankruptcy trustee no interest adverse to the trust," it is also well settled that a trustee may not profit "in any manner" from his or her handling of the estate. 2 Remington on Bankruptcy § 1117.75, p. 586 (1956).

The Act will not exclude a nominee or remove an incumbent from serving as trustee for a bankruptcy estate "[m]erely" because such person is the estate's largest creditor. 2 Remington on Bankruptcy § 1096, p. 551 (1956). On the other hand, the grounds for removing a trustee do not necessarily have to consist of a showing of actual misconduct. The paramount consideration with which this court must be concerned regarding the administration of a bankruptcy estate is the welfare of that estate itself. 2 Remington on Bankruptcy § 1111, p. 570 (1956).

In our case, Avery Gross was elected on January 19, 1978 to be trustee of the bankrupt's estate, of which his father, Reuben Gross, was the largest creditor. He also had personally assisted his father in the action which resulted in the judgment against the bankrupt. Later, during 1978, however, Reuben Gross died and left a will appointing his son, Avery, the primary executor of the testamentary estate and naming him a residuary beneficiary thereunder. Pursuant to the law of New York, Avery Gross's newly acquired role as executor imposed on him a fiduciary duty to conserve his father's estate to the utmost of his abilities. N.Y.E.P.T.L. § 11–1.1(a)(3) (McKinney 1967). New York law specifically includes "executors" within the meaning of "fiduciary." Section 11–1.1(a)(3) of the New York Estate Powers and Trust Law provides in relevant part:

"As used in this section, unless the context or subject matter otherwise requires, ... (3) the term 'fiduciary' means ... executors...."

Whereas the role of an executor as a fiduciary would require him to be committed to the best interests of the testamentary estate, the federal Bankruptcy Act provides that the bankruptcy trustee serve for the benefit of *all* creditors. Where there are assets common to both a testamentary estate and to a bankruptcy estate, these two roles would be incompatible, at least *prima facie*. Admittedly, to exclude some one from serving as trustee on this ground alone without any showing of an actual conflict of interest may be shortsightedly discriminatory. *See In re Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2d Cir. 1965) ("Potential conflicts of interest do not of themselves disqualify creditors from being appointed trustees in bankruptcy...."). I think Avery Gross's actions in his administration of the Russo estate, however, do present sufficient indicia of a conflict of interest. A mere summarization of his dealings with the bankruptcy estate will suffice for this end.

It should be noted at the outset that in no way do I impugn Mr. Gross's diligence in carrying out his duties as trustee. In fact, I have on occasion made reference to his ardent commitment to these duties. I am critical, however, of the motives that appear to have spurred his diligence.

This conflict of interest is best illustrated by his actions with respect to his father's judgment against Russo. Notwithstanding the fact that Section 67(a) requires the trustee to make a timely determination of the validity of any lien or encumbrance on the bankrupt's estate, *see* A. Paskay, "Trustee' and Receivers' Handbook," 11A Collier on Bankruptcy ¶ 13.004, p. P–409 (14th ed. 1978), he failed and continues to fail to make any such definitive determination. Even during the trial on his removal as trustee, he equivocated on whether or not his father's judgment constituted a lien under the law of New York. Overall, his testimony was that he was not sure of the

legal significance of the judgment. Yet, in his application to abandon the trustee's interest in the Romer Road property, he quite clearly referred to this judgment as a lien.

Based upon my interpretation of the law of New York, however, I have found that the judgment did constitute a lien and therefore is voidable under Section 67(a). Furthermore, I have found that Reuben Gross waived whatever secured status he may have had by participating in the election of the trustee for the bankrupt's estate. In apparent disregard of these considerations, the trustee has still found insufficient cause to avoid his father's lien.

In retrospect, it now sadly appears that much of his diligence was spent in an effort to aggrandize his and/or his father's interests. First, in order to have the judgment become enforceable against the bankrupt's interest in the Romer Road property, it was necessary to have the bankrupt's fraudulent conveyance of the subject property avoided. Not only did Avery Gross accomplish this, but in addition he sought to reap further benefits by being appointed attorney for the trustee *nunc pro tunc* and thereby be awarded legal fees for this accomplishment. Previously, Avery Gross as trustee had retained the services of Leon Brickman, whose application failed to disclose his relationship with the judgment creditor. Brickman represented Reuben Gross in the original attorney's fees action against Russo, which in turn gave rise to the Gross judgment. I noted this oversight in my memorandum on Avery Gross's application for attorney's fees for his services. *In re Russo*, Bkrtcy. No. 78–B–22, slip op. at 7 (B.C. E.D.N.Y. April 15, 1980). In his own application to be appointed attorney to the trustee, *nunc pro tunc*, he similarly failed to disclose his personal interest in the estate based on his testamentary executorship and beneficiary status under his father's will. These lapses clearly contravene the purpose of Bankruptcy Rule 215(a) which calls for complete disclosure of any personal interest in the bankrupt's estate. Rule 215(a) provides in pertinent part:

"*Conditions of Employment of Attorneys and Accountants.* No attorney or accountant for the trustee or receiver shall be employed except upon order of the court. The order shall be made only upon application of the trustee or receiver, stating the specific facts showing the necessity for such employment, the name of the attorney or accountant, the reasons for his selection, the professional services he is to render, and to the best of the applicant's knowledge *all of the attorney's or accountant's connections with the bankrupt, the creditors, or any other party in interest, and their respective attorneys and accountants.* If the attorney or accountant represents or holds no interest adverse to the estate in the matters upon which he is to be engaged, and his employment is in the best interest of the estate, the court may authorize his employment."

Avery Gross's efforts to have the judgment enforced, however, was frustrated, at least initially. Although he sought to have the property preserved in the hands of the bankrupt's wife so that the judgment could become an enforceable lien, I rejected this alternative and ordered Tina Russo to reconvey the Romer Road property back to herself and her husband. Upon reconveyance, the trustee acquired title to the bankrupt's interest in the property as of the date when Russo filed his bankruptcy petition. The trustee's interest thus prevented the Gross judgment from being enforceable at this stage. Judge Nickerson, in affirming my decision rejecting Mr. Gross's preservation remedy, noted the unfairness of putting a bankrupt's creditors in a better position than if no transfer had taken place.

Second, in an apparent attempt to circumvent the effect of my decision reconveying the property to the bankrupt and his wife, he ultimately resorted to making an application to abandon the trustee's interest in the Romer Road property. This was Mr. Gross's most egregious error of judgment in his capacity as trustee. As trustee, he is empowered to abandon any property of the estate that is worthless or unprofitable.

*See, e.g., In re Ira Haupt & Co.*, 398 F.2d 607, 612–13 (2d Cir. 1968). Nevertheless, had this alternative been pursued and in the unlikely event that I would have approved such an application, then the Gross judgment would have been enforceable upon the bankrupt's reacquisition of his interest, in his own right, in the Romer Road property. Again, however, since Reuben Gross chose to participate in the trustee's election, he thereby waived the secured status of his claim and, as I noted earlier in this decision, state law cannot be used to short-circuit the ends of federally enacted policy. As applied here, a creditor can not reap the benefits of filing as an unsecured creditor and then expect to be entitled to the advantages accorded a secured creditor.

Upon application of any party in interest or on the court's own initiative, this court is authorized to remove a trustee "for cause" and appoint a successor. Section 2(a)(17) of the Act, 11 U.S.C. § 11(a)(17); Bankruptcy Rule 221(a). Historically, a court of equity has "always" had the inherent jurisdiction to remove trustees for cause pursuant to the court's duty to oversee that trusts are executed properly. 2 Remington on Bankruptcy § 1111, p. 570 (1956). The Act, however, does not state what constitutes "cause," thus the determination of the sufficient grounds for removal is largely within the court's discretion. The Act merely requires that trustees be "competent to perform their duties...." Section 45 of the Act, 11 U.S.C. § 73.

Unfortunately, "cause for removal" is not susceptible to "sharp definition." 2 Remington on Bankruptcy § 1111, p. 570 (1956). One court explained the problem in the following:

"Bankruptcy proceedings are not created for the benefit of the trustee or of attorneys. The prime necessity is to preserve the estate for the benefit of the creditors. A trustee may be able and perfectly honest, and yet the court may be satisfied that it is not for the best interests of the estate that he continue to act." *Woodford v. Cosden & Co.*, 289 F. 67, 68 (8th Cir. 1923).

Since it is the welfare of the estate that is the primary concern of this court, the grounds for removing a trustee do not necessarily have to encompass actual malfeasance. Most importantly, it is vital to the administration of a bankrupt's estate that the trustee be independent, vigorous and efficient. Regarding the special concerns inherent in a conflict of interest issue, the following has been noted:

"Although there may be no present necessary conflict of interest between the elected trustee and the best interests of the creditors generally, potentiality of conflict may be so apparent as to warrant disapproval of the ... [trustee]." 2 Remington on Bankruptcy § 1099.50, pp. 555–56 (1956).

As a result of the incompatibility between Avery Gross's responsibilities as executor of his father's estate, and as trustee of the Russo estate, I must order that he be removed as trustee of the bankrupt's estate.

A final matter concerns attorney's fees and legal expenses. The bankrupt, as part of this motion, requests that he be awarded legal fees and costs. The granting of these expenses is within the sound discretion of the court.

Upon a review of the history of this motion and of the entire bankruptcy proceeding since its inception more than four years ago, I find that he is not entitled to be granted costs and legal fees. In light of his participation in the fraudulent conveyance of his interest in the Romer Road property, he surely does not have clean hands. In my decision of November 30, 1979, I found that his conveyance of his interest in that property was fraudulent under the debtor and creditor laws of New York, particularly as an attempt to defraud Reuben Gross. It would thus be unfair to reward such behavior by granting legal fees and expenses to this party.

The motion to remove Avery J. Gross, as trustee, is granted. The attorney for the bankrupt shall submit an order to this effect within ten days providing for the ap-

pointment of a successor trustee pursuant to Rule 221(a) of the Rules of Bankruptcy Procedure.