**In re KAM KUO SEAFOOD CORP.,
f/k/a Aco Seafood Corp., Debtor.**

**Bankruptcy No. 83 B 11836 (HCB).**

United States Bankruptcy Court,
S.D. New York.

Sept. 10, 1984.

Office of the United States Trustee, New York City, Cornelius Blackshear, New York City, of counsel.

Robert P. Herzog, New York City, for Interim Trustee.

Goldman, Frier & Altesman, New York City, for Board of Trade of Wholesale Seafood Merchants; Albert Altesman and Joseph Frier, New York City, of counsel.

Kelly, Lucas & Mohen, New York City, for Edward Lee, Individually, and Kam Man Food Products, Inc.; Thomas P. Mohen, New York City, of counsel.

## DECISION & ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The Board of Trade of Wholesale Seafood Merchants (the "Board"), an association of wholesale seafood businesses, requests an order of this Court resolving an election dispute with the United States Trustee who refuses to certify its election as trustee of this Chapter 7 estate.

### I

In September 1983, Kam Kuo Seafood Corporation ("Debtor") was having difficulty meeting payments due to its suppliers, most of whom were members of the Board. Its president, Edward Lee, consequently opened settlement discussions with Edward

F. Ryan, executive secretary of the Board. Consequently, the Board called a meeting of the creditors of Kam Kuo Seafood Corporation at which a creditors' committee ("Committee") was appointed. Ryan was selected as secretary to the Committee and the law firm of Goldman Frier & Altesman, attorneys for the Board, was retained as counsel.

Debtor proposed a settlement agreement ("Agreement) in October, 1983, pursuant to which:

1. Simultaneously with the execution of the Agreement, Debtor was to deliver to the Board, as Distributor-Escrowee, an assignment for the benefit of creditors, which would be held in escrow by the Board, and filed in the event of a default by Debtor under the Agreement.

2. Creditors would be paid 25% of their claims in full discharge of such claims. Of this 25%, 15% would be paid upon acceptance of the Agreement by 85% of the creditors, in number and amount, with the remaining 10% deferred until April 15, 1984.

3. One-third of the initial 15% payment, amounting to $80,000, in the form of an irrevocable letter of credit ("letter of credit") from the United Orient Bank, would be delivered to the Board as Distributor-Escrowee, on or before the execution of the Agreement.

4. After obtaining consent of 85% of creditors, the Board would declare the Agreement in effect, and Debtor would then deliver the remaining two-thirds of the initial 15% payment, as well as another irrevocable letter of credit from the United Orient Bank guaranteeing the deferred 10% payment to the Board as Distributor-Escrowee.

5. In addition to the 25% settlement amount, Debtor was to pay $20,000 to the firm of Goldman Frier & Altesman, as attorneys for the Committee and the Board, of which $5,000 was to be paid upon signing of the Agreement and $15,000 to be paid upon obtaining consent from 85% of the creditors.

6. The initial payment of $5,000 to Goldman Frier & Altesman would be returned in the event that sufficient creditor acceptance (85%) was not obtained.

Accordingly, at the time the proposed agreement was made, the Committee was given the letter of credit dated October 14, 1983 in the amount of $80,000 (⅓ of the initial 15% payment), which expired by its own terms on November 30, 1983, as well as an assignment for the benefit of creditors designating Ryan as assignee.

The Board, in late November apparently believed it had verbal consent of at least 85% of creditors to the Agreement and Assignment. On November 29, 1983, prior to receiving the necessary consents in writing, Ryan notified Debtor that the Agreement was in effect. Lee verbally extended the letter of credit which Ryan presented for deposit at Chemical Bank on December 6, 1983, notwithstanding the fact that the letter of credit expired by its own terms on November 30, 1983. The Board, however, never received the necessary consents in writing, and the Agreement could not be effectuated. The letter of credit was not honored by Chemical Bank and was returned to the Board in February 1984.

Once Ryan realized that the Agreement could not be put into effect for want of the necessary consents by creditors, he had Lee execute a new assignment for the benefit of creditors on December 14, 1983, agreeing to hold the new assignment for one week while Lee attempted negotiations with his "backer". Such negotiations failed. The assignment for the benefit of creditors, dated December 14, 1983, together with an affidavit by Ryan, was filed with the Clerk of the Supreme Court for the State of New York, County of New York on December 21, 1983.

Subsequently, because of the threat of legal action, by the landlord of a warehouse leased by the Debtor, the Board, as

assignee, filed an involuntary petition in bankruptcy against the Debtor on December 28, 1983 pursuant to § 303 of the Bankruptcy Code, 11 U.S.C. § 303 (1978) (the "Code"). An order for relief under Chapter 7 was entered by this Court on January 30, 1984, and an interim trustee (11 U.S.C. § 15701(a)), John S. Pereira, was appointed on February 3, 1984. Robert P. Herzog was retained as counsel to the interim trustee.

Six weeks later, on March 12, 1984, the Board sent a letter to the interim trustee outlining its activities as assignee between October 20 and December 14, 1983 and enclosing reports, worksheets, and copies of checks deposited into assignee's account.

At the meeting of creditors pursuant to 11 U.S.C. § 341(a), held on April 24, 1984, Ryan, representing the Board, requested an election of a trustee. No other parties requested that an election be held. Nominations were requested and Ryan nominated the Board. There were no other nominations. Ryan then voted for the Board which purported to represent claims in the amount of $433,891.17. There were no other votes. The United States Trustee reported to this Court that it could not make a report, pursuant to Rule X–1006(c) of the Rules of Bankruptcy Procedure ("Rules"), that a trustee had been elected. By Notice of Motion dated May 4, 1984, the Board sought to have the election controversy resolved.

While the motion was pending, but before it came on to be heard on June 12, 1984, the Board filed its final report and account as assignee on June 7, 1984.

## II

■ The United States Trustee ("U.S. Trustee") system is prophylactic. It was intended by Congress to relieve bankruptcy judges of administrative and supervisory roles required by the former Bankruptcy Act, 11 U.S.C. § 1 *et seq.* (repealed) thereby leaving them free to resolve disputes untainted by knowledge of matters unnecessary to a judicial determination. The U.S. Trustee, rather than the Court, appoints trustees and supervises administration of bankruptcy cases, in addition to presiding at the meeting of creditors held pursuant to § 341 of the Code. Pursuant to § 702 of the Code, creditors may, at that meeting, elect one person to serve as trustee in the case. The U.S. Trustee is required by Rule X–1006(c) of the Rules to report to the Court if a trustee is elected. Where there is an election dispute, and the U.S. Trustee refuses to approve the election by transmitting to the court the names of the elected trustee, the bankruptcy court must assume the duty of resolving the conflict.

■ That power is explicitly provided in § 105(a) of the Code enabling the bankruptcy court to issue any order, process or judgment necessary to carry out the provisions of the Code. Its exercise, however, is not unlimited. It is necessarily constrained by § 321 of the Code governing the eligibility requirements for trustee. Section 324 of the Code in empowering the bankruptcy court to remove a trustee for cause. Together, these sections necessarily imply that the power vested by § 105 to resolve an election dispute where the U.S. Trustee refuses to certify an election of a trustee, is to be exercised in light of the requirements of §§ 321 and 324 of the Code. To hold otherwise would be to deprive creditors of their right of election and, in effect, return the bankruptcy courts to the appointive process.

■ But where, for example, acts by the proposed trustee equivalent to cause are shown, the refusal of the U.S. Trustee to certify the election should be sustained. The U.S. Trustee in the exercise of his administrative duties should not be compelled to certify the election of a proposed trustee where there is sufficient concern for the full administration of the estate in the best interests of creditors.

## III

■ Paramount to consideration of a challenge to the election of a trustee is the welfare of the estate itself. *See, Matter of Russo,* 18 B.R. 257 (Bankr.E.D.N.Y.1982).

Such is to be measured, at least in part, by a willingness and ability to maximize the estate and to comply with the Bankruptcy Code and the Rules of Bankruptcy Procedure. Equal to these is a concern for the putative trustee's full appreciation of the fiduciary nature of the trustee-estate relationship. One who seeks to assume the mantle of trustee but who has evidenced a lack of understanding of the role of a fiduciary should not be confirmed in that position over objection. "The conduct of bankruptcy proceedings not only should be right but must seem right." *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir.1964).

The Board's conduct in this case evokes a sharp concern for the best interests of the creditor body on each of these grounds.

First, its belated accounting for the property of the Debtor held by the Board as custodian demarks a lack of familiarity with or unwillingness to comply with the Code and Rules. Rule 6002(a), in implementing the mandate of §§ 543(b)(2) of the Code that "[a] custodian shall ... file an accounting of any property of the debtor, or proceeds of such property, that, at any time, came into the possession, custody, or control of such custodian," requires that an accounting be filed promptly. However flexible that term may be depending upon the complexity of the task required and the custodian's lack of familiarity with the property held, it is not to be deemed satisfied where a custodian having had the familiarity with a seemingly uncomplicated estate during the months before bankruptcy substantially delayed in filing the requisite documents. It is assuredly not satisfied by a five week delay here in even sending an interim report to the interim trustee. Most certainly, the requirement of Rule 6002(a) cannot be said to have been satisfied in a case such as this where the custodian's full report and accounting was not filed until five months after the entering of an order for relief at the custodian's behest and then only, it seems, to support the instant motion at which such compliance is an issue.

Such delay might be explainable in a complex case but there is no claim of undue or overwhelming complexity here. Rather, the Board proffers the excuse that the delay was due to waiting until all checks had cleared before filing its report and transmitting to the interim trustee the balance of the assignee's account. Why simple check clearing should have taken so long, however, is unexplained. More significantly, at least two of these checks, one payable to the Board's law firm and one payable to the Board's "Special Account," were drawn on February 17, 1984 more than two weeks after the Board filed the involuntary petition in this case. The drawing of these checks, moreover, clearly violated § 543(a) of the Code. That section provides:

A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

The Board's inability or unwillingness to comply with these most elemental provisions of the Code and Rules designed to promote the administration of the estate and to preserve its assets for distribution equally to creditors hardly befits it to assume the administrative and distributive duties of a trustee. Substantial delay would be of sharp concern to a court in awarding trustee's commissions. *See, In re Ferkauf, Inc.*, 42 B.R. 852 (Bankr. S.D.N.Y.1984). The payments would constitute cause for removal.

## IV

These concerns for stewardship are compounded in this case by the Board's conduct prior to bankruptcy. The Board, in apparent justification of its conduct, argues that it did not assume the status of assignee under New York's Assignment for Bene-

fit of Creditors Law § 3 (McKinney's 1945) prior to recording the assignment on December 21, 1983.[1] In this the New York courts give no clear guidance. Some have held that a failure to fulfill all of the statutory requirements of acknowledgement by assignor and assignee and recordation does not render the assignment void, since such requirements are merely directory. *See, Warner v. Jaffray,* 96 N.Y. 248 (1884) (holding that assignee took title from the time of the making and delivery of the assignment); *In re S. Feldman & Co., Inc.,* 237 A.D. 720, 262 N.Y.S. 681 (1st Dept.1933); *In re Berman,* 173 A.D. 689, 160 N.Y.S. 79 (1st Dept.1916); *Wasserman v. Raynor's Fur Corporation,* 137 Misc. 872, 244 N.Y.S. 110 (N.Y. City Court, Special Term 1930). More recent cases, expressing concern for third parties having dealings with the assignor and former creditors, have stated that the requirements of the statute are mandatory and all the procedures set forth in § 3 must be completed before the assignment instrument is deemed to take effect, at least as far as such third parties are concerned. *See, Metro Burak, Inc. v. Rosenthal & Rosenthal, Inc.,* 83 Misc.2d 637, 372 N.Y.S.2d 781 (N.Y.Sup.Ct.1975), *modified on other grounds,* 51 A.D.2d 1003, 380 N.Y.S.2d 758 (2nd Dept.1976).

Resolution of that issue, however, is not required here for it is apparent that the Board failed in even the minimal task of obtaining creditor consents in writing and breached the Agreement in that its attorneys failed to return the $5,000 payment as the Agreement required "in the event sufficient acceptances are not obtained from the merchandise creditors as herein required." Furthermore, between the filing date of the assignment on December 21, 1983, and January 9, 1984, the date when a lien search was ordered, the Board, as assignee, did nothing to preserve the debtor's inventory in cold storage in New Jersey and in several independent freezers.

Our concern is not when the assignment became effective under New York law, but a putative trustee's concept of stewardship and his compliance with accounting and investigative duties. The discharge of these duties requires candor before all courts and fair dealing. Those concepts do not permit the filing of an affidavit in connection with the assignment which stated that the debtor lacked accounts receivable when in fact a major asset of the estate consists of accounts receivable. They further do not permit the conflict of interest the Board, as trustee, would face in seeking to collect the payment made to its attorneys both before and after the filing of the bankruptcy petition.

1. That section provides:

Every conveyance or assignment made by a debtor of his estate, real or personal, or both, to an assignee for the creditors of such debtor, shall be in writing, and shall specifically state therein the residence and kind of business carried on by such debtor at the time of making the assignment, and the place at which such business shall then be conducted and if such place be in a city, the street and number thereof, and if in a village or town such apartment designation as shall reasonably identify such debtor.

Every such conveyance or assignment shall be duly acknowledged before an officer authorized to take the acknowledgement of deeds and shall be recorded in the county clerk's office in the county where such debtor shall reside or carry on his business at the date thereof. An assignment by co-partners shall be recorded in the county where the principal place of business of such co-partners is situated. An assignment by a corporation shall be recorded in the county where its principal place of business is situated. When real property is a part of the property assigned, and is situated in a county other than the one in which the original assignment is required to be recorded, a certified copy of such assignment shall be filed and recorded in the county where such property is situated.

The assent of the assignee, subscribed and acknowledged by him, shall appear in writing, embraced in or at the end of, or endorsed upon the assignment, before the same is recorded, and, if separate from the assignment, shall be duly acknowledged.

In all cases where an assignment is made by a corporation the right to recover the amount due from stockholders on unpaid capital stock issued to or subscribed for by them shall pass to the assignee whether mentioned in the assignment or not. As amended L. 1914, c. 360, § 1, eff. April 15, 1914.

N.Y. Debtor and Creditor Law, § 3 (McKinney's 1945) (emphasis added)

None of this is to say that assignees for the benefit of creditors are ineligible to serve as trustees. They clearly are and elections of an assignee for the benefit of creditors as trustee in bankruptcy have been approved by the courts. *See, e.g., In re Kutcher,* 69 F.2d 104 (2d Cir.1934); *In re Katz & Williams, Inc.,* 48 F.Supp. 683 (S.D.N.Y.1941). But what has emerged here is a picture of an assignee who has given no indication of its ability or intent, should it be permitted to serve as trustee of the debtor's estate, to comply with the Code and the Rules or to adopt the high standard of fiduciary behavior required of a trustee in bankruptcy. These shortcomings raise serious doubts as to the quality of stewardship that could be expected from the Board in future transactions with this Debtor, and constitute cause more than sufficient to compel this Court to deny the Board's motion to compel the U.S. Trustee to certify its election as trustee. The motion is denied.

It is SO ORDERED.